257 N.J. Super. 219 (1992)
608 A.2d 386
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOEL STELZNER, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LAURENCE BECKER, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
STEVEN FORTE, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH T. INGARGIOLA, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
GEORGE JOHNSON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued and Submitted April 1, 1992.
Decided June 11, 1992.
*222 Before Judges DREIER, GRUCCIO and BROCHIN.
*223 Daniel Cohen argued the cause for appellant Stelzner (Krantz & Cohen, attorneys).
Louis M. Barbone argued the cause for appellant Becker (Jacobs, Bruso & Barbone, attorneys).
Thomas F. Pitaro, attorney for appellant Forte.
Kenneth F. Hense argued the cause for appellant Ingargiola (McGlynn, Reed, Hense & Pecors, attorneys).
William J. Farley, Jr., attorney for appellant Johnson.
Jeffrey L. Weinstein, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney).
The opinion of the court was delivered by GRUCCIO, J.A.D.
Defendants Joel Stelzner, Laurence Becker, Steven Forte, Joseph T. Ingargiola and George Johnson collectively appeal from the judge's denial of their motions for suppression of hotel billing records and other evidence arising out of an investigation into a card-shuffling scheme in Atlantic City. After their motions were denied, defendants pled guilty to various forms of cheating at casino gambling.
Defendants were indicted by an Atlantic County Grand jury on January 20, 1988, charging each with conspiracy, N.J.S.A. 2C:5-2 (count one); theft by deception, N.J.S.A. 2C:20-4 (counts two and four); and swindling and cheating at casino gambling, N.J.S.A. 5:12-113 (counts three and five).
Pursuant to plea agreements, the State agreed to recommend sentencing at a third-degree level if Ingargiola, Stelzner and Becker would plead guilty to the second-degree charge. Forte pled guilty to a third-degree theft and Johnson pled guilty to a fourth-degree crime. Defendants pled, preserving the right to challenge the judge's rulings on their suppression motion.
Stelzner was sentenced to a three-year term, ordered to make restitution of $67,500 and assessed a $30 Violent Crimes Compensation *224 Board (VCCB) penalty. Becker was sentenced to a three-year term, ordered to make restitution of $22,500 and was assessed a $30 VCCB penalty. Forte was sentenced to a four-month term with two years' probation, ordered to make restitution of $11,250 and assessed a $30 VCCB penalty. Ingargiola was sentenced to a three-year term, ordered to make restitution of $123,750 and was assessed a $30 VCCB penalty. Johnson was sentenced to two years' probation, fined $7,500 and assessed a $30 VCCB penalty.
On appeal, defendants contend:
1. The receipt of hotel-toll billing records by Sergeant Kontakis on January 29, 1987, was a warrantless seizure under both the Fourth Amendment to the United States Constitution and Article 1, Paragraph 7 of the New Jersey Constitution.
2. The warrantless seizure of phone billing records on January 29, 1987, was unlawful since violative of New Jersey Constitution, Article 1, Paragraph 7.
3. The hotel-toll billing records seized after January 29, 1987, were illegal fruit of the first unlawful seizure and must also be suppressed.
4. The Grand Jury subpoenas are void nunc pro tunc and all documents secured by their authority must be suppressed.
5. The admissibility of records secured pursuant to a Nevada Administrative Subpoena, violative of New Jersey law, requires a remand to determine the agent's vel non between New Jersey and Nevada police officers.
6. The Casino Control Act, N.J.S.A. 5:12-1 et seq. was intended by the legislature to be the exclusive vehicle for prosecutions alleging swindling and cheating at casino gaming.
The facts as developed in the motion proceeding, in sum, establish that on August 10, 1986, Stelzner, Becker and Ingargiola participated with a casino card dealer in defrauding an Atlantic City casino by cheating at cards. They returned, along with Forte, and cheated another casino in a similar manner on February 16, 1987. Johnson's role was to recruit a casino dealer to participate in the scheme, for which Johnson was paid independent of the card game. On each of these two occasions, in excess of $75,000 was illegally won by defendants.
In seeking dealers to participate in the scheme, defendants solicited Geraldine Sears, a reception desk clerk, who reported it to Harrah's security manager in January 1987. He, in turn, reported this information to Sergeant Sam Kontakis of the New *225 Jersey State Police, who was assigned to enforce the Criminal Code and Casino Control Act[1] at the Atlantic City casinos. Sergeant Kontakis interviewed Sears on January 28, 1987, and learned that she had been approached by "Larry Vegas," who gave her a scrap of paper. Sears told Sergeant Kontakis of the gaming system Vegas proposed and gave him the paper which contained a room number and telephone number of the Quality Inn where Vegas said he could be reached. Sergeant Kontakis went to the Quality Inn on January 29 and spoke with Carrie Strogus at the registration desk. She reported that the room was registered to Becker and Larry Duncan. She indicated that Becker had already checked out, but Duncan was still there.
Sergeant Kontakis asked Strogus for a copy of the registration card for the room, at which point she observed Duncan crossing the lobby and leaving with an unknown woman. Kontakis followed Duncan but obtained no useful information. When he returned, Strogus gave him a computer printout for their room, which she noted had been paid for by Becker with an American Express card. Although the printout he was given included records of local and long-distance telephone calls, Kontakis stated that his primary interest was in the names and addresses, which were all he had requested.
Sergeant Kontakis ran the names through a computer to check for prior criminal history. Thereafter, he realized that the bulk of the printout concerned telephone calls, for which he knew a court order was required. Sergeant Kontakis returned the original computer printout to the Quality Inn, on his own initiative, retaining neither notes of the telephone information nor a copy of the printout. He gave no instructions to hotel personnel. Kontakis then discussed his actions with Sergeant *226 Medolla.[2]
On February 10, 1987, Sergeant Kontakis was ordered off the matter, and Detectives James Leary and Richard Loufik, investigators under Medolla, took over the case. Medolla previously had been aware of Kontakis's activities in this matter and discussed them with Deputy Attorney General Sheri Tanne. Tanne instructed Medolla to ensure that Kontakis not become further involved in the case, as his awareness of the telephone records, not secured by a warrant, could taint the investigation.
Detective Leary specialized in the investigation of card-dealer scams and was peripherally aware of Sergeant Kontakis's initial investigation. Leary spoke with Kontakis about the nature of Sear's assertions and the result of her interview. At that point, Leary learned nothing of the telephone records Kontakis had obtained. When he assigned Leary to take over the investigation, Medolla told him to have no contact with Sergeant Kontakis. Leary realized that this was unusual since the line officer (Kontakis) normally worked in tandem with the special investigations unit (Detectives Leary and Loufik). Leary concluded that Kontakis had done something to require his removal from the investigation.
Detective Leary called Wilbur Johnson, the Director of Security for the Quality Inn and its related hotel, the Comfort Inn, and requested that he quickly secure any information concerning Becker and Duncan. Although not then specifically aware that Sergeant Kontakis had obtained and returned telephone billing records, Leary suspected as much.
Detective Leary then received the name and address information and asked Wilbur Johnson not to tell him anything about telephone records, but, instead, to secure them until a subpoena could be obtained. Leary's interest in the records was to identify other Atlantic City dealers who had been contacted by *227 defendants and might have participated in the scam. Prior to obtaining a subpoena, the only information Leary had learned from Sergeant Kontakis, Sergeant Medolla, Wilbur Johnson and his own investigation was that telephone calls had been made from Becker's room.
Detective Leary was informed by Wilbur Johnson in early February that Becker's registration provided a Las Vegas address. Although the billing records showed his address as "5030 Paradise NY," the zip code provided was for Las Vegas and Becker told Sears that he was from that city. After Leary had obtained the names of Becker and Duncan, he contacted Nevada Gaming Commission Officer Richard Yuhas and requested that he check the "5030 Paradise" address in Las Vegas and provide him with any telephone number registered there. Leary learned from Yuhas that the telephone at that address was registered to Stelzner.
Detective Leary sought a subpoena for billing and telephone records from Quality Inn, Comfort Inn and American Express. He supported the request with an affidavit detailing his investigation, but excluding any reference to Sergeant Kontakis's previous receipt and return of the telephone records. The subpoena was issued and the records were obtained. The Quality Inn records were generated on January 29, while the Comfort Inn records were generated between February 8 and 15.[3]
Defendants contend that the motion judge erred in finding that Sergeant Kontakis did not "seize" the Quality Inn telephone records in any sense which implicated constitutional protections. They claim that Kontakis violated the warrant requirement of N.J. Const. art. I, para. 7. The U.S. Supreme Court recognized in Smith v. Maryland, 442 U.S. 735, 745-746, *228 99 S.Ct. 2577, 2582-2583, 61 L.Ed.2d 220, 230 (1979), that only the contents of a telephone conversation are protected, not material beyond that conversation, such as the telephone number called.
However, the New Jersey Constitution is more protective of the privacy interest in telephone numbers. Information concerning calls made and received cannot be disclosed to police without a warrant issued upon probable cause. State v. Hunt, 91 N.J. 338, 348, 450 A.2d 952 (1982). The warrant and probable cause requirements apply to disclosures of telephone numbers called by a hotel guest. State v. Mollica, 114 N.J. 329, 345, 554 A.2d 1315 (1989). The State concedes that Sergeant Kontakis was mistakenly given defendants' telephone billing records without having a warrant. But, if those records were obtained pursuant to an improper search or seizure, the records, as well as any information flowing from their acquisition, would be subject to suppression as fruit of unlawful police conduct. Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 445 (1963) (evidence arising by exploitation of illegality is suppressed; evidence obtained by means sufficiently distinguishable from the primary illegality may be admitted); State v. Johnson, 118 N.J. 639, 652, 573 A.2d 909 (1990).
Here, the court ruled that no seizure occurred since Sergeant Kontakis neither directly nor indirectly sought the numbers. The judge stated:
I find that he did not request telephone tolls, but received them, and that he returned them a day or two later without having copied or analyzed them.
Those being the circumstances that the Court finds believable and credible under the circumstances, I determine that there is no unlawful act requiring the application of the Exclusionary Rule.
This was not a search or seizure in violation of the Defendants' rights.
The Court determines that the Detective innocently came upon the toll billing in his possession, and not being unlawful, does not taint the investigation, nor did it even require his removal [from the investigation].
....

*229 I am satisfied that Detective Kontakis did not act unlawfully in his initial possession of the records, and as such does not  that does not require suppression.
We first point out that the Constitution does not proscribe all seizures, but only those which are unreasonable. State v. Bruzzese, 94 N.J. 210, 218, 463 A.2d 320 (1983), cert. den., 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). Where police obtain evidence without a warrant, "the proper inquiry for determining the constitutionality of a search-and-seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable, without regard to his underlying motives or intent." Id. 94 N.J. at 219, 463 A.2d 320. See also Horton v. California, 496 U.S. 128, 140, 110 S.Ct. 2301, 2310, 110 L.Ed.2d 112, 124 (1990) (evenhanded law enforcement is best achieved by the application of objective standards of conduct rather than standards that depend upon the subjective state of mind of the officers). A pedantic focus upon the literal meaning of "seizure" is inapposite in this context.
Here, the motion judge accepted as credible and reliable Sergeant Kontakis's testimony that he sought only those records which would reveal the names and addresses of those persons registered in the room number given by "Mr. Vegas," and who had articulated the intent to defraud the Atlantic City casinos. Defendants do not contend that Kontakis was not entitled to this information, but rather claim constitutional violations based upon the protected records he received in response to his legitimate request.
The motion judge described Sergeant Kontakis's state of mind as "innocent," and defendants demonstrate nothing, aside from his brief physical control and custody over all hotel billing records, to prove otherwise. Even if evidence of improper motive were present, a subjective bad motive does not invalidate a warrantless seizure which is objectively reasonable. State v. Bruzzese, supra, 94 N.J. at 221, 463 A.2d 320 ("[c]omplex creatures that they are, humans usually have several *230 motives. A judge cannot and should not be required to weigh the motives to determine which one guided the officer's behavior"); State v. Cooper, 211 N.J. Super. 1, 20, 510 A.2d 681 (App.Div. 1986) (subjective motive to arrest felon, though police had no warrant, did not invalidate objectively reasonable presence of police for a different purpose in home where felon was found).
The court's conclusion that there was no seizure of the records rests on its acceptance of the fact that Sergeant Kontakis limited his request to biographical data and his receipt of telephone data was the unsolicited result of the independent action of the hotel clerk. Defendants point to nothing in the record which demonstrates that the court erred in this finding.
Defendants look beyond Sergeant Kontakis, contending that even if his actions were objectively reasonable, Strogus acted as a police conduit, and, hence, unconstitutionally elicited protected information. They claim that when Strogus obtained telephone data, this activity constituted state action for which the State is required to obtain a warrant. We disagree.
In support of their position, defendants place particular emphasis upon State v. Droutman, 143 N.J. Super. 322, 362 A.2d 1304 (Law Div. 1976). There the telephone company initiated a trace on calls from defendant's home as part of its in-house, annoying-caller prevention program. The court ruled that the company could turn over information to police, which was obtained from defendant's telephone without a warrant, only if the company was not a state actor when it intercepted the telephone information:
The minimal degree of official involvement with private action needed to activate Fourth Amendment safeguards is set forth in United States v. Clegg, 509 F.2d 605 (5 Cir.1975). It was there held (at 609) that "only when the government has preknowledge of and yet acquiesces in a private party's conducting a search and seizure, which the government itself, under the circumstances, could not have undertaken" does the problem of compliance with Fourth Amendment standards arise. (Emphasis supplied.) If the facts support this threshold level of tacit cooperation, state action would exist for purposes of this argument.
*231 State v. Droutman, supra, 143 N.J. Super. at 328-29, 362 A.2d 1304.
In Droutman, the parties had stipulated that the police neither participated nor intervened in the tracing operation, which was purely a company action to deal with annoyance calls. Id. at 329, 362 A.2d 1304. Thus, there was no state action and defendant suffered no implication of his constitutional rights. Ibid. See also State v. Pemberthy, 224 N.J. Super. 280, 295, 540 A.2d 227 (App.Div.), certif. den., 111 N.J. 633, 546 A.2d 547 (1988) (even if telephone company's interception and tracing of defendant's calls were improper, the fruit of that impropriety would not be excluded in a prosecution by the State since the company was acting without cooperation or acquiescence of the State).
We cited to Droutman as well as Clegg in finding no state action where private security officers of a casino detained and searched a defendant without probable cause and subsequently turned over to police evidence of drug use taken from his person. State v. Sanders, 185 N.J. Super. 258, 265, 448 A.2d 481 (App.Div. 1982). In such circumstances, state action may be found "when there is joint participation between private citizens and police officers, when the state has significantly involved itself in the illegal search, or when the private search was sufficiently fostered or encouraged by the State." Ibid. The trial court in Sanders found no joint participation in the search even though a state police officer was in the casino during Sanders' detention and was just outside the room where Sanders was searched. The finding was not disturbed on appeal since it was supported by the record. Id. at 266, 448 A.2d 481.[4] Therefore, the evidence obtained by the casino without probable cause was admissible in a prosecution by the State. Ibid.
*232 Here, the recording of telephone calls by the hotel is not at issue since the hotel properly records toll calls in order to charge patrons for them. It, nevertheless, has an obligation to protect that information from disclosure since the mere fact that calls are made from a hotel does not place the calling information in the public domain. State v. Mollica, supra, 114 N.J. at 344, 554 A.2d 1315. The information here is available to the State unless the hotel's action was prompted by the State in the manner described in Droutman. State v. Sanders, supra, 185 N.J. Super. at 268, 448 A.2d 481. Defendants do not contend that the hotel could not possess the records, but only that those records were improperly divulged at the insistence of the State through Sergeant Kontakis.
The only direct evidence on this point came through the testimony of Sergeant Kontakis, which we have recounted above. No one else saw the telephone information in the records and Kontakis did not use that information because it was unimportant to his primary focus. He was promptly and effectively shielded from the ensuing investigation.
The evidence here demonstrates that Strogus's actions were not sufficiently influenced by Sergeant Kontakis to require the conclusion that she was a state actor. Kontakis was neither present when Strogus printed out the telephone record nor did he direct or encourage her to do so. There was no joint participation in the acquisition of the information from the hotel computer. Kontakis was ignorant of the telephone information and came by it innocently. There was no significant involvement in its retrieval or procurement. Nor can it be said that Kontakis fostered or encouraged the inclusion of improper information along with that which he had properly requested. None of the three circumstances by which a citizen's action can evolve into state action, as discussed in State v. Sanders, supra, 185 N.J. Super. at 265, 448 A.2d 481 and State v. Droutman, supra, 143 N.J. Super. at 322, 362 A.2d 1304, is demonstrated by this record.
*233 Defendants also contend that the impropriety engaged in by Sergeant Kontakis and Strogus infected the State's subsequent investigation, and that the search warrant later obtained for defendants' telephone records was tainted. In this regard, the motion judge found:
Further, I have reviewed the affidavit which was ultimately submitted in which the Order resulted to obtain the records. And I am satisfied that there is nothing in that affidavit which came from the toll records which were already possessed, previously possessed and returned, and now by the affidavit sought again.
There is insufficient evidence in the record to show that any of the information in that affidavit came from  came from the original possession of the toll billing records.
As just explained, we do not conclude that the telephone billing records were illegally obtained by Sergeant Kontakis. However, even if they had been, where evidence has been illegally obtained by the State, its use is governed by consideration of three factors: temporal proximity between the illegal conduct and the challenged evidence; the presence of intervening circumstances; and the flagrancy and purpose of police misconduct. State v. Harvey, 121 N.J. 407, 418, 581 A.2d 483 (1990), cert. den., ___ U.S. ___, 111 S.Ct. 1336, 113 L.Ed.2d 268 (1991) (applying these tests to allow admission of a confession even if police did not scrupulously honor the defendant's right to remain silent). Whether evidence is the fruit of illegal conduct and is, therefore, to be suppressed, or is, instead, the product of independent and lawful police activity, is a factual matter for the court. State v. Johnson, supra, 118 N.J. at 653, 573 A.2d 909. In reviewing fact-findings of the trial judge, we defer to the court's ability to weigh credibility. Our function is to determine if there is sufficient credible evidence to support the judge's findings. State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964).
The motion judge here found that Sergeant Kontakis's testimony was credible and reliable and that Detective Leary's affidavit in support of the warrant was in no way reflective of or dependent upon the earlier possession of those records by *234 Kontakis. Defendants fail to demonstrate any error in these findings. Leary admitted that he spoke with Kontakis before February 10, when Kontakis was removed from the case, but emphasized that they never discussed anything Kontakis had learned from the telephone information in those records. Sergeant Medolla related to Leary the substance of what Kontakis had found in his investigation before February 10, but none of that information related to the substance of telephone records obtained by Kontakis.
Defendants vigorously contend that knowledge of the fact that Sergeant Kontakis had received telephone records tainted later police activity, citing State v. Sugar, 100 N.J. 214, 227, 495 A.2d 90 (1985), appeal after remand, 240 N.J. Super. 148, 572 A.2d 1170 (App.Div.), certif. den., 122 N.J. 187, 584 A.2d 247 (1990). In Sugar, the Court disqualified, as a matter of law, only those police personnel who were actually responsible for the illegal wiretap. For those who had only indirectly heard or learned about the illegally intercepted statement, the Court authorized the trial judge to determine whether they could testify truthfully despite their exposure or taint. Ibid. Where police lawfully obtain information, outside the scope of illegally seized telephone records, the wrongfully acquired records do not mandate suppression of evidence properly procured pursuant to the search warrant. State v. Hunt, supra, 91 N.J. at 349, 450 A.2d 952.
Defendants emphasize the fact that the records given to Sergeant Kontakis and those later seized pursuant to a search warrant by Leary were the same telephone records. Kontakis returned the records given to him on January 29, and in early February, Detective Leary requested the hotel to secure any records it had concerning defendants. The hotel simply put aside the records returned by Kontakis and produced them in March when served with the warrant. We cannot conclude that Leary and Kontakis somehow conspired to gain the records and capitalize upon Kontakis's allegedly illegal initial seizure. Defendants' *235 challenge to the warrant resulting from Leary's affidavit fails to link this factual connection with any impropriety.
To succeed in challenging a warrant's supporting affidavit, defendants must allege deliberate falsehood or reckless disregard for the truth and must support such allegations by reliable proof sufficient to establish material falsity by a preponderance of evidence. Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667, 682 (1978); State v. Sheehan, 217 N.J. Super. 20, 25, 524 A.2d 1265 (App.Div. 1987). These requirements apply where the allegations are that the affidavit, though facially accurate, omits material facts. Ibid.; State v. Meighan, 173 N.J. Super. 440, 449, 414 A.2d 576 (App.Div.), certif. den., 85 N.J. 122, 425 A.2d 280 (1980). The factual findings of the motion judge belie defendants' contentions.
Defendants contend that the subpoenas issued for the hotel telephone records and for billing records of American Express were invalid since they were issued by the prosecutor's office before the grand jury was in session. We find this contention without merit.
The office of the Attorney General issued the subpoenas in the name of the grand jury in February 1987, commanding the recipients to appear before the grand jury in Trenton on March 13, 1987. The recipients each produced the records sought by the subpoenas in lieu of a personal appearance before the grand jury, a decision made by them and not by the Attorney General. There was nothing erroneous in this procedure:
As the State points out, each subpoena directed the recipient to go to the grand jury on the return date; a grand jury was sitting on each return date, and each witness was expressly told that he could go before the grand jury should he choose to do so. The fact that the materials were voluntarily handed to the prosecutor is of little importance since the crucial factor is the opportunity and not the necessity of going before the grand jury. (citations omitted).
We do not think that our previous decision in In re Grand Jury Subpoena Duces Tecum v. State, 167 N.J. Super. 471 [401 A.2d 258 (App.Div. 1979)], calls for a different result. There, we stated that where the validity of a subpoena is challenged, the State need establish preliminarily merely (1) the existence of a *236 grand jury investigation and (2) the nature and subject matter of that investigation. 167 N.J. Super. at 472 [401 A.2d 258]. Nowhere in the opinion do we state at what point the grand jury should come into existence.
State v. Hilltop Nursing Home, Inc., 177 N.J. Super. 377, 396, 426 A.2d 1041 (App.Div. 1981).
The judge recognized that the face of each subpoena offered the opportunity to appear before the grand jury, although defendants argued that the grand jury which indicted them only assembled in August 1987 and January 1988 and not in March 1987, which was when the subpoenas were returnable. The test cited by the court was whether the subpoenaed witnesses were provided with opportunity to appear before a grand jury on the return date. Nothing in the record contravened the fact that the face of the subpoenas articulated the recipient's option of appearing with the documents instead of merely volunteering them to the prosecutor.
The State's burden to show opportunity to appear before the grand jury is slight and may be satisfied by: (1) simple representation by counsel to the court that a grand jury investigation has been commenced; and (2) a recitation of the nature of the investigation. In re Grand Jury Subpoena Duces Tecum v. State, supra, 167 N.J. Super. at 472, 401 A.2d 258. Here, the opportunity to appear before the grand jury is adequately established on the face of these subpoenas, at least in the absence of any countervailing evidence in the record.[5]
Defendants also contend that the telephone data information obtained in Nevada, in accord with Nevada law, should have been excluded here since the means by which it was secured in Nevada would not meet the requirements of New Jersey law. We reject this contention and point out that we *237 recently rejected a like contention in State v. Engel, 249 N.J. Super. 336, 592 A.2d 572 (App.Div. 1991), where New Jersey police officers obtained telephone toll records by contacting police in Rockland County, New York, who obtained the records without a warrant as permitted by New York law and then sent them to the Bergen County Prosecutor. There we stated:
We perceive no jurisprudential principle requiring, or even permitting, us to give extraterritorial effect to our Constitution. Recognition of this inherent jurisdictional limitation on the application of our Constitution is consonant with recognized principles of federalism.
....
... Whether or not New York State officials acted as agents of the Bergen County Prosecutor, the fact remains that the seizure was in accordance with the law of the jurisdiction in which it took place. Since the seizure was not illegal where it occurred, exclusion would serve no deterrent effect.
Id. at 368-69, 592 A.2d 572. We there distinguished State v. Mollica, supra, 114 N.J. at 355, 554 A.2d 1315, finding it limited to situations where evidence is seized in this State by foreign officers. State v. Engel, supra, 249 N.J. Super. at 367-68, 592 A.2d 572. Only then need a court look to the level of cooperation between officers of the two jurisdictions to determine whether the seizure by foreign officers, in a manner allowed by their governing law but prohibited by New Jersey, should be excluded by a New Jersey court. Clearly, obtaining telephone information in Nevada by officers there is admissible in New Jersey even if Nevada allows procurement of the records in a manner repugnant to our Constitution and even if the Nevada officials acted as agents of police.
Here, the motion judge found no illegal act since the records were seized in Nevada according to its law and by its officials. We find no error in this conclusion.
Defendants contend that the Casino Control Act in Title 5 contains a specific criminal prohibition for swindling and that therefore, they could only be prosecuted under that provision. As noted above, Ingargiola and Stelzner each were convicted under N.J.S.A. 2C:20-4. Forte's charge was amended to a third-degree theft; the others were convicted of second-degree *238 thefts, while Johnson was convicted under N.J.S.A. 5:12-113. The Title 2C offense is a second-degree crime (third-degree as amended with regard to Forte), while the Title 5 offense is one of the fourth-degree. N.J.S.A. 2C:20-2; N.J.S.A. 2C:20-4; N.J.S.A. 5:12-113.
N.J.S.A. 5:12-113 provides:
a. Except as provided in subsection b., any person who by any trick or sleight of hand performance, or by a fraud or fraudulent scheme, cards, dice or device, for himself or for another wins or attempts to win money or property or a representative of either or reduces a losing wager or attempts to reduce a losing wager in connection with casino gaming is guilty of a crime of the fourth degree and notwithstanding the provisions of N.J.S. 2C:43-3 shall be subject to a fine of not more than $25,000.00, and in case of a person other than a natural person, to a fine of not more than $100,000.00 and any other appropriate disposition authorized by N.J.S. 2C:43-2b.
b. Any person who by any trick or sleight of hand performance, or by fraud or fraudulent scheme, cards, dice or device, for himself or for another wins or attempts to win money or property or a representative of either or reduces a losing wager or attempts to reduce a losing wager in connection with casino gaming is guilty of a disorderly persons offense if the value of such money or property or representative of either is $25.00 or under.
The theft-by-deception statute, N.J.S.A. 2C:20-4, punishes obtaining property by purposefully creating or failing to correct a false impression. State v. Krueger, 241 N.J. Super. 244, 249, 574 A.2d 1006 (App.Div. 1990).
The question of whether a specific act containing a criminal offense bars prosecution under a more generally applicable criminal statute is a matter of legislative intent. State v. Gledhill, 67 N.J. 565, 573, 342 A.2d 161 (1975); State v. States, 44 N.J. 285, 291, 208 A.2d 633 (1965). Thus, where the Credit Card Act prohibited fraudulent use of a credit card, and the general fraud statute prohibited obtaining goods by a fraudulent writing, the later-enacted credit card statute did not prevent prosecution under the general fraud statute where defendant obtained goods by forging the authorized signature when using a stolen credit card. State v. Gledhill, supra, 67 N.J. at 580, 342 A.2d 161.
No preemption of the general criminal law was found in Gledhill, despite the fact that both statutes applied to defendant's *239 misconduct, and the credit card statute included a provision of the criminal law with which it was inconsistent. Statutes are not inconsistent merely because they overlap in prohibiting the same act. Ibid. For the Credit Card Act to supersede the general criminal fraud statute, the legislative intent to supplant the general fraud statute in such circumstances would have to be manifest and capable of no other reasonable interpretation. Ibid.
Despite defendants' assertions that the casino industry is heavily regulated and controlled, they point to no evidence that the Legislature intended to limit casino theft prosecutions to only the fourth-degree crime set out in N.J.S.A. 5:12-113. Just as in Gledhill, the specific act and the general criminal law may cover the same conduct, but that alone is insufficient to establish a legislative intent to bar the latter and limit the prosecutor to only the former. See State v. Krueger, supra, 241 N.J. Super. at 249, 574 A.2d 1006; State v. Bennett, 194 N.J. Super. 231, 235, 476 A.2d 833 (App.Div. 1984).
Here, the Casino Control Act provides that it prevails in the event another statute is inconsistent with, in conflict with, or contrary to it. N.J.S.A. 5:12-133b. However, the test for such inconsistency, described in Gledhill, is not met. The language of the Casino Control Act as to swindling does not irrefutably demonstrate a legislative intent to always supplant the general criminal law.
Indeed, the Casino Control Act provides that, where the value of property won by swindling and cheating exceeds $25, it is a crime of the fourth degree but "notwithstanding the provisions of N.J.S. 2C:43-3 shall be subject to a fine of not more than $25,000.00, ... and any other appropriate disposition authorized by N.J.S. 2C:43-2b." N.J.S.A. 5:12-113a. Thus, where the Legislature intended to override Title 2 with regard to swindling casinos, a specific reference was included to expand the permissible punishment.
*240 Further, nothing in State v. Perlman, 169 N.J. Super. 190, 404 A.2d 643 (Law Div. 1979), indicates that the fourth-degree crime set out in N.J.S.A. 5:12-113 was intended to be the sole prosecutorial option for swindling activities. In fact, it held that N.J.S.A. 2A:85-5, the then-existing statute making criminal an attempt to commit any crime prohibited by law, applied to N.J.S.A. 5:12-113, making an attempt to swindle, which was not then explicitly prohibited in the swindling statute, a crime. The attempt statute in Title 2 "is generally applicable to attempts to commit all crimes and was not made inapplicable to criminal violations of the Casino Control Act." State v. Perlman, supra, 169 N.J. Super. at 195, 404 A.2d 643. Applying the Title 2 provision along with the swindling provision of Title 5 served to achieve the apparent legislative intent of deterring swindling and cheating and avoiding an economic windfall of any nature. Id. at 197, 404 A.2d 643.
Reading the theft-by-deception statute to apply along with the swindling statute achieves that same legislative objective; swindlers may be prosecuted under the Casino Control Act and face 18 months and a fine of up to $25,000, or they may be prevented from achieving economic windfall by prosecution for theft-by-deception under Title 2A and face up to 10 years in prison and a fine and restitution of up to $100,000. The two criminal prohibitions not being inconsistent, the employment of either is a matter of the prosecutorial discretion recognized in State v. Gledhill, supra, 67 N.J. at 580, 342 A.2d 161.
Affirmed.
NOTES
[1] N.J.S.A. 5:12-1 to -190.
[2] Medolla believed that he had instructed Kontakis to return the computer printout.
[3] Leary believed this showed that the records returned by Kontakis had been retained and secured pursuant to his request that they not be purged until a subpoena could be issued.
[4] The court reversed the trial court's finding, however, that the State fostered or encouraged the search by the security procedures built into the Casino Control Act. We stated that the detention without probable cause was not what the Act intended and such action should not be held against the State.
[5] The State defends the subpoenas on the ground that they demonstrate an opportunity to appear before the grand jury, but also contends that defendants have no standing to raise the issue since defendants were not the recipients of the subpoenas. In light of our finding above, we need not address the standing issue. But see State v. Alston, 88 N.J. 211, 228, 440 A.2d 1311 (1981).