**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0684-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MICHAEL ALLEN,

    Defendant-Appellant.

_____

> Argued February 25, 2025 – Decided March 19, 2025
>
> Before Judges Gilson and Firko.
>
> On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 21-04-0823.
>
> Michael T. Ashley argued the cause for appellant (Law Office of Thomas R. Ashley, attorneys; Thomas R. Ashley, on the brief).
>
> Rachel M. Lamb, Assistant Prosecutor, argued the cause for respondent (Grace C. Macaulay, Camden County Prosecutor, attorney; Rachel M. Lamb, of counsel and on the brief).

PER CURIAM

Defendant Michael Allen appeals from his guilty plea conviction for first-degree aggravated manslaughter. He contends the trial court erred in denying his motion to suppress a handgun that was seized from his person, claiming the trial court applied a "reasonable suspicion" rather than a "probable cause" standard when police stopped and arrested him. Defendant also argues the trial court erred in denying him a Franks[1] hearing and in denying his motion for reconsideration. After reviewing the record and arguments of the parties in light of the governing legal principles, we affirm.

I.

We discern the following pertinent facts and procedural history from the record. On September 25, 2020, at approximately 3:25 p.m., Camden County Metro Police Department (CCMPD) officers responded to a shot-spotter notification for sixteen suspected gunshots in the vicinity of 807 Lois Street in Camden. Upon arrival, the officers found Justin Ingram (victim) lying on the sidewalk near 3002 Hope Street. The victim sustained numerous gunshot wounds and was transported to the hospital for treatment, but died that day.

During their crime scene investigation, detectives found sixteen 9-millimeter shell casings and interviewed multiple eyewitnesses. One eyewitness

---

[1] Franks v. Delaware, 438 U.S. 154 (1978).

A-0684-23

observed the victim standing near 3002 Hope Street until an individual wearing a hooded sweatshirt approached the victim from behind and started shooting him. The eyewitness stated the shooter chased the victim towards the corner of Hope Street and Lemuel Avenue where the victim collapsed.

Another eyewitness heard approximately fifteen gunshots while returning to their residence near the intersection of Hope Street and Lemuel Avenue. The eyewitnesses described the suspect as a black male approximately "nineteen[-] or twenty[-]years old," with a "slim build," and "[a]fro hair style." The eyewitness observed the suspect run, enter the front passenger seat of a grey sedan, and flee from the area towards 31st Street.

Detectives retrieved video surveillance footage from the Lemuel Avenue area, which showed a 2013 gray Hyundai Sonata sedan[2] with tinted side windows traveling in the area. At the time of the homicide, the footage revealed that the suspected shooter exited the vehicle with his hands in his pockets, and cut through the side yard towards the rear of 3002 Hope Street. In addition, the footage showed the same individual running back toward the gray Hyundai Sonata and re-entering the front passenger seat, which drove away.

---

[2] The Hyundai Sonata had been previously stolen and was registered in Pennsylvania.

A-0684-23

Officers also recovered and reviewed real time tactical operation intelligence center (RTTOIC) [3] surveillance videos from the homicide date. One of the cameras near 1100 Princess Avenue captured a male, later revealed to be Jawan Coley, speaking to two unidentified males. In the video, Coley was walking toward Park Boulevard and Langham Avenue at 3:05 p.m. and was seen entering into the rear driver's passenger side of the gray Hyundai Sonata. The vehicle traveled to 1405 Park Boulevard, which is Coley's residence. Detectives also observed the vehicle's driver and front seat passenger and tracked the Hyundai Sonata traveling on several roads, which included the area of the homicide, to the Lansdowne Avenue and Ormond Avenue intersection, through surveillance and automatic license plate readings.

On September 26, 2020, Dr. Gerald Feigin conducted a post-mortem examination of the victim. Dr. Feigin concluded the victim was struck by

---

[3] The RTTOIC is operated twenty-four hours a day and seven days a week and acts as a nerve center for deployment of law enforcement resources, response to emergency call for service, and monitoring technology systems. In addition to improving operational coordination, this technology allows the department to coordinate with field units to detect and respond to observed conditions, increasing intelligence and information sharing. U.S. Department of Justice, Successful Practices and Strategies – Camden County Police Department, https://cops.usdoj.gov/pdf/CPOS/ss/2.02_SPS_Camden_final.pdf (last visited Mar. 12, 2025).

A-0684-23

gunfire fourteen times, which led to the victim's demise. On the same day, officers found the gray Hyundai Sonata parked in a dirt lot near the Lansdowne Avenue and Ormond Avenue intersection. The officers also gathered video footage from multiple sources in the area.

Detectives reviewed the video footage and saw the gray Hyundai Sonata traveling towards the dirt lot after the shooting at around 3:38 p.m. Three minutes later, defendant and the other two suspects walked from the dirt lot area towards Princess Street. Suspect number three, later identified as defendant, is captured on video wearing gray pants and black, blue, and white sneakers, consistent with the shoes and clothing worn by the shooter.

Detectives retrieved additional video footage, showing defendant and the two other suspects entering a residence located at 1244 Princess Avenue after traveling from the area where the Hyundai Sonata was found. Defendant[4] and the two other suspects walked out of the residence, about seven minutes later, and continued walking down the street. As they were walking, suspect number two, later identified as Lionel Perry, separated from the group and headed to the

---

[4] In the footage, defendant changed his clothing and was wearing a white short-sleeved shirt, blue jeans, and black, white, and red sneakers. The other suspects wore the same clothes, but changed their sneakers. At the time of the shooting, video footage depicted defendant wearing a light-colored, long-sleeved shirt.

A-0684-23

Langham Avenue area while defendant and Coley traveled to 1405 Park Boulevard and entered that residence at approximately 4:04 p.m.

On September 28, 2020, law enforcement obtained information that the individuals who committed the homicide used a residence located at 1405 Park Boulevard. Accordingly, law enforcement applied for a warrant to search that residence, a two story, single-family row home, the gray Hyundai Sonata, and 1244 Princess Avenue, which is Perry's residence.

That same day, Investigator Tyler Pickard and Detective Matthew DiDomenico conducted surveillance at 1405 Park Boulevard. Pickard testified at the suppression hearing that he was working on a narcotics task force with the Camden County Prosecutor's Office. The officers were provided with three photographs of defendant, Coley, and Perry, and were advised these individuals were homicide suspects. Defendant was specifically identified as the suspected shooter.

Pickard knew defendant from previous encounters. The officers were informed that a search warrant for the residence had been submitted. They parked their unmarked vehicle near 1405 Park Boulevard. Pickard testified the officers were told to report "anything [they] saw coming or going from the

A-0684-23

home."  The surveillance started at approximately 1:45 p.m., and the search warrant was approved less than five minutes later.

Pickard and DiDomenico observed defendant and Coley walk across Park Boulevard, enter the residence, and leave twenty minutes later.  As defendant and Coley exited the residence and walked away, Pickard informed his supervisor about the officers' observations.  Pickard identified defendant as one of the individuals who exited the residence.  The supervisor told the officers to detain defendant and Coley as the search warrant team was not ready to move in.

The officers watched defendant and Coley cross multiple streets and turn down an alleyway.  Pickard, wearing his police identifiers and tactical vest, jumped out of his vehicle and followed defendant and Coley while the other officers pulled the vehicle over. The officers followed on foot and radioed ahead to the other officers.  Pickard testified the officers exited their vehicles, identified themselves as police officers, approached defendant and Coley, and commanded them to stop.  Coley was apprehended "very shortly" thereafter, but defendant failed to stop, fled on foot, and headed back down the alley.  Pickard pursued defendant on foot and "tackled him by his legs" in the middle of the

7

street.  Defendant was then handcuffed "sometime after 3:00 p.m."  Pickard arrested defendant "75 to 100 yards" from 1405 Park Boulevard.

Pickard asked defendant if he could search him.  Defendant consented, and Pickard patted him down.  Defendant informed Pickard that he had a firearm in his pants.  Pickard recovered a handgun in the left ankle area of defendant's long johns, and that handgun was later connected to the homicide.  Defendant and Coley were arrested and taken into police custody.

In April 2021, defendant was charged by indictment with four crimes: first-degree murder, N.J.S.A. 2C:11-3(a)(1)(2) (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count two); first-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count three); and fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a)(2) (count four).  Defendant was fifteen years old at the time he was charged with these crimes.

Defendant moved to suppress the handgun seized on the basis that the search was conducted without a search warrant or probable cause and asked for a Franks hearing to challenge the truthfulness of the affidavit.  On August 16, 2022, the trial court convened a suppression hearing and heard testimony from Pickard.  That same day, the trial court denied the motions and placed its reasons

for its ruling on the record. The trial court found Pickard was "credible" and that the warrantless stop of defendant was valid. The trial court reasoned Pickard had a warrant for the premises, he "knows who he's looking for," and "he's familiar with defendant," which created "reasonable suspicion."

Defendant moved for reconsideration. Following oral argument, the trial court denied defendant's reconsideration motion in an oral decision. The trial court rejected defendant's argument that Pickard had "no personal knowledge . . . [of] defendant's alleged previous conduct" when he arrested him, and therefore, had insufficient "evidence" to stop and arrest defendant. In addition, the trial court rejected defendant's contention that the Supreme Court's recent decision in State v. Goldsmith[5] was applicable to this case.

In July 2023, defendant was charged in an amended indictment with: first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1) (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count two); first-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count three); and fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a)(2) (count four). On the same date, defendant pled guilty to count one of the

---

[5] 251 N.J. 384 (2022).

amended indictment—first-degree aggravated manslaughter—in exchange for a dismissal of his remaining charges.

On September 22, 2023, defendant was sentenced to a seventeen-year term in New Jersey State Prison, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, with five years' parole supervision after release. On October 12, 2023, an amended judgment of conviction was issued to reflect that defendant was sentenced to a seventeen-year term subject to NERA under his plea agreement. Defendant is confined at the Garden State Youth Correctional Facility.

This appeal followed. Defendant raises the following contentions for our consideration:

> POINT ONE
>
> THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS AND ERRED IN APPLYING A "REASONABLE SUSPICION" RATHER THAN "PROBABLE CAUSE" STANDARD; BECAUSE THE SEARCH WARRANT DID NOT PARTICULARLY LIST [DEFENDANT], OR ANY PERSON, THE STOPPING AND ARRESTING OF [DEFENDANT] BY THE POLICE WAS IN VIOLATION OF AND CONTRARY TO THE FOURTH AMENDMENT.
>
>> A. THE TRIAL COURT'S DECISION ON THE SUPPRESSION MOTION.

B.    THE RELEVANT STANDARD.

C.    TO BE VALID A WARRANT MUST
DESCRIBE WITH PARTICULARITY
THE PLACE OR PERSON TO BE
SEARCHED AND HERE ONLY THE
PREMISES WAS NAMED.

D.    INCLUSION IN THE WARRANT TO
SEIZE AND SEARCH "ALL PERSONS
PRESENT" IS FACIALLY INVALID.

E.    THE OMISSION IN THE WARRANT OF
NAMING THE DEFENDANT . . . , OR
EVEN "ALL PERSONS PRESENT," IS A
FATAL DEFECT AND CANNOT BE
CONSIDERED A MERE TECHNICAL
IRREGULARITY.

F.    NONE OF THE EXCEPTIONS TO A
WARRANTLESS SEARCH EXISTS IN
THIS        CASE        MANDATING
SUPPRESSION.

POINT II

THE TRIAL COURT ERRED IN DENYING A
HEARING    PURSUANT    TO    FRANKS    V.
DELAWARE.

A. THE TRIAL COURT'S DECISION ON A
FRANKS HEARING.

B. REASONS        FOR        A        FRANKS
EVIDENTIARY HEARING.

11

POINT III

THE TRIAL COURT ERRED IN DENYING THE MOTION FOR RECONSIDERATION AND SHOULD BE REVERSED AS IT BASED IT DECISION ON A PALPABLY INCORRECT OR IRRATIONAL BASIS; DEFENDANT WAS NOT INVOLVED IN ANY CONDUCT WHICH CONSTITUTED PROBABLE CAUSE OR REASONABLE SUSPICION PRIOR TO THE SEARCH OF HIS PERSON ON SEPTEMBER 28, 2020.

    A.   THE TRIAL COURT'S DENIAL OF THE MOTION FOR RECONSIDERATION.

    B.   THE LAW AS TO RECONSIDERATION MOTIONS.

    C.   THE GOLDSMITH CASE SUPPORTS SUPPRESSION.

    D.   REASONS FOR RECONSIDERATION AND REVERSAL.

II.

The scope of our review of a trial court's decision on a motion to suppress is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). "Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.' " State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. S.S., 229 N.J. 360, 374 (2017)). We defer to those factual

12

findings because of the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Accordingly, we "ordinarily will not disturb the trial court's factual findings unless they are 'so clearly mistaken "that the interests of justice demand intervention and correction." ' " Goldsmith, 251 N.J. at 398 (quoting State v. Gamble, 218 N.J. 412, 425 (2014)). However, legal conclusions drawn from those facts are reviewed de novo. State v. Radel, 249 N.J. 469, 493 (2022).

A.

We first address defendant's contention that the trial court erred in denying his motion to suppress by applying an incorrect standard of reasonable suspicion and not probable cause. Defendant argues that he was not identified on the search warrant for 1405 Park Boulevard, and not detained on the "immediate premises." The State counters the motion to suppress was properly denied because the officers had reasonable suspicion for an investigative stop based on the totality of the circumstances, and defendant was not arrested on the search warrant. The State argues the officers had reasonable suspicion for an investigative detention when they observed defendant—a homicide suspect—

13

enter the residence they were currently surveilling, which was connected to the homicide.

Warrantless searches are presumptively invalid, and "[t]he warrant requirement . . . may be dispensed with in only a few narrowly circumscribed exceptions," State v. Patino, 83 N.J. 1, 7 (1980). "To justify a warrantless search or seizure, 'the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement.' " State v. Vanderee, 476 N.J. Super. 214, 230 (App. Div. 2023). Each exception to the warrant requirement has its own essential elements that must be satisfied to justify a warrantless search. State v. Johnson, 476 N.J. Super. 1, 20 (App. Div. 2023).

One such exception is an investigative or Terry[6] stop exception, "which is a procedure that involves a relatively brief detention by police during which a person's movement is restricted." Goldsmith, 251 N.J. at 399 (citing State v. Rosario, 229 N.J. 263, 272 (2017)). "An investigative stop or detention does not offend the Federal or State Constitution, and no warrant is needed, 'if it is based on "specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion of criminal

---

[6] Terry v. Ohio, 392 U.S. 1 (1968).

activity.' " Ibid. (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). Reasonable suspicion "is a less demanding standard than probable cause." Ibid. However, "[n]either 'inarticulate hunches' nor an arresting officer's subjective good faith" will satisfy this constitutional requirement. Ibid. (quoting State v. Arthur, 149 N.J. 1, 8 (1997)).

"[I]n determining the lawfulness of an investigat[ive] stop, a reviewing court must 'evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions.' " State v. Privott, 203 N.J. 16, 25-26 (2010) (quoting State v. Davis, 104 N.J. 490, 504 (1986)). Thus, a court must consider the entire picture rather than each fact in isolation. State v. Nelson, 237 N.J. 540, 554-55 (2019) (citing D.C. v. Wesby, 583 U.S. 48, 60 (2018)). "[T]he touchstone for evaluating whether police conduct has violated constitutional protections is reasonableness." State v. Bard, 445 N.J. Super. 145, 157 (App. Div. 2016) (internal quotation marks omitted).

A Terry stop and the frisk are analyzed under separate standards. Terry, 392 U.S. at 27. "The first component of the Terry rule concerns the level of reasonable suspicion that must exist before an 'investigat[ive] stop' legitimately

15

may be undertaken." State v. Thomas, 110 N.J. 673, 678 (1988). Our Supreme Court has stated that a police officer may conduct an investigative stop if, "based on the totality of the circumstances, the officer had a reasonable and particularized suspicion to believe that an individual has just engaged in, or was about to engage in, criminal activity." State v. Stovall, 170 N.J. 346, 356 (2002).

Defendant argues the trial court erred in denying his motion to suppress because he was not identified in the search warrant for 1405 Park Boulevard, and he was not detained on the "immediate premises" but was stopped on Kenwood Avenue, which is ten blocks away. Defendant asserts the search warrant omits a "particularized description or naming" of defendant.

Citing State v. Marshall, defendant avers that such failure to comply with the particular requirement in the application on search warrant is a constitutional violation that cannot be deemed as "technical insufficiencies or irregularities, R[ule] 3:5-7(g), justifying overlooking the deficiencies in the warrant." 199 N.J. 602, 618 (2009). Defendant maintains this "defect" is exacerbated by the accompanying incident/arrest report, which is devoid of any articulated basis for having stopped and searched defendant other than the fact he exited 1405 Park Boulevard. We are unpersuaded.

The unrefuted evidence establishes Pickard was told that defendant was a suspect in a homicide investigation and given his photograph, which was moved into evidence at the suppression hearing. Moreover, Pickard testified that he was "familiar" with defendant.

The Terry exception to the warrant requirement permits an officer to detain an individual for a brief period and pat him or her down for the officer's safety, if that stop is "based on 'specific and articulable facts, which taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." Rodriguez, 172 N.J. at 126 (quoting Terry, 392 U.S. at 21). Under this well-established standard, we are satisfied the investigatory stop was valid here because Pickard and the other officers had a "particularized suspicion" based on the photograph of defendant they had and given the information that a homicide investigation was underway that was connected to the residence, defendant was described as the suspected shooter, and Pickard was familiar with him.

Accordingly, that the search warrant did not authorize the search or seizure of any person, and did not identify defendant, is irrelevant. The trial court properly determined that Pickard and the other officers had a reasonable

articulable suspicion to conduct a <u>Terry</u> stop. The record supports that conclusion.

Moreover, the totality of the circumstances also supports the State's position that Pickard and the other officers had a reasonable and articulable suspicion to frisk defendant. Pickard had been told that defendant was the suspected shooter, and therefore, he had reason to believe that defendant might be armed. Further, defendant refused to stop and fled when officers first approached him. Given those facts, it was reasonable to search defendant's person for Pickard's safety. Because we have determined the <u>Terry</u> stop and frisk of defendant were lawful, the handgun seized during the pat down search was also lawful.

## B.

We next address whether the trial court erred in finding defendant did not make a substantial preliminary showing that the affidavit contained falsehoods or statements made with reckless disregard for the truth. Defendant contends the affiant, Detective Jeremy Jankowski, a Special State Investigator and Acting County Detective, should have testified at an evidentiary hearing to determine the veracity of his affidavit.

18

In Franks, the United States Supreme Court imposed limitations on when a defendant may "challenge the truthfulness of factual statements made in an affidavit supporting [a search] warrant." 438 U.S. at 155. In State v. Howery, the New Jersey Supreme Court adopted the test and procedures announced in Franks, holding "New Jersey courts, in entertaining veracity challenges, need go no further than is required as a matter of [f]ederal [c]onstitutional law by [Franks]." 80 N.J. 563, 568 (1979).

Under the Franks/Howery standard, a "presumption of validity with respect to the affidavit supporting the search warrant" must be overcome before a defendant is entitled to an evidentiary hearing. Franks, 438 U.S. at 171; accord Howery, 80 N.J. at 566. "First, the defendant must make a 'substantial preliminary showing' of falsity in the warrant." Howery, 80 N.J. at 567 (quoting Franks, 438 U.S. at 170). Second, the defendant must allege a "'deliberate falsehood or [ ] reckless disregard for the truth,' pointing out with specificity the portions of the warrant that are claimed to be untrue" by a preponderance of the evidence. Id. at 567-68 (quoting Franks, 438 U.S. at 171). "Finally, the misstatements claimed to be false must be material to the extent that when they are excised from the affidavit, that document no longer contains facts sufficient to establish probable cause." Id. at 568 (citing Franks, 438 U.S. at 171-72).

A-0684-23

The same analysis applies when the defendant alleges the affidavit omitted material facts.  See State v. Sheehan, 217 N.J. Super. 20, 25 (App. Div. 1987) ("the defendant must make a substantial preliminary showing that the affiant, either deliberately or with reckless disregard for the truth, failed to apprise the issuing judge of material information which, had it been included in the affidavit, would have militated against issuance of the search warrant"); accord State v. Stelzner, 257 N.J. Super. 219, 235 (App. Div. 1992).

In State v. Broom-Smith, we emphasized that a Franks/Howery hearing "is aimed at warrants obtained through intentional wrongdoing by law enforcement agents and requires a substantial preliminary showing[.]"  406 N.J. Super. 228, 240 (App. Div. 2009).  And as our Supreme Court reaffirmed, a "defendant's burden under Franks and Howery is high[.]"  State v. Desir, 245 N.J. 179, 198 (2021).

Applying that standard, we agree with the trial court's conclusion that defendant failed to show that the affidavit contained deliberate falsehoods or reckless disregard for the truth.  Defendant did not make a preliminary showing of falsity in the search warrant and did not point to any specific sections in the search warrant that support his allegations of deliberate falsehood or reckless disregard for the truth.  We reiterate a Franks/Howery evidentiary hearing is

required only where there is a showing of deliberate falsehoods or reckless disregard for the truth, that is, disregard for the facts that undergird the State's application for a search warrant. In these circumstances, we see no falsification or reckless disregard for the truth that would necessitate an evidentiary Franks/Howery hearing, much less invalidate the search warrant.

III.

We need only briefly address defendant's contention that the trial court abused its discretion in denying the motion for reconsideration. Defendant also argues the trial court erred by not applying the Goldsmith decision, which was decided by our Supreme Court forty-two days prior to the suppression hearing.

A trial court's order on a motion for reconsideration will not be set aside unless shown to be a mistaken exercise of discretion. Granata v. Broderick, 446 N.J. Super. 449, 468 (App. Div. 2016) (citing Fusco v. Bd. of Educ., 349 N.J. Super. 455, 462 (App. Div. 2002)). Reconsideration should only be granted in those cases in which the court had based its decision "'upon a palpably incorrect or irrational basis,'" or did not "'consider, or failed to appreciate the significance of probative, competent evidence.'" Ibid. (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)).

A motion for "[r]econsideration cannot be used to expand the record and reargue a motion." Cap. Fin. Co. of Del. Valley v. Asterbadi, 398 N.J. Super. 299, 310 (App. Div. 2008). It "is designed to seek review of an order based on the evidence before the court on the initial motion, . . . not to serve as a vehicle to introduce new evidence in order to cure an inadequacy in the motion record." Asterbadi, 398 N.J. Super. at 310; see also Palombi v. Palombi, 414 N.J. Super. 274, 288 (App. Div. 2010) (finding that a motion for reconsideration "is not appropriate merely because a litigant is dissatisfied with a decision of the court or wishes to reargue a motion . . . ").

A court may "in the interest of justice" consider new evidence on a motion for reconsideration only when the evidence was not available prior to the decision by the court on the order that is the subject of the reconsideration motion. D'Atria, 242 N.J. Super. at 401; see also Palombi, 414 N.J. Super. at 289 (finding that facts known to the party prior to entry of an original order did not provide an appropriate basis for reconsideration); see also Fusco, 349 N.J. Super. at 462 (finding the party not entitled to reconsideration where evidence was available but not submitted to the court on the motion for the original order).

Defendant argues that Goldsmith supports suppression of the handgun in this case because Pickard detained defendant, based on a "mere hunch" when he

A-0684-23

exited the residence.  Defendant also reiterates, there was no probable cause to justify his warrantless search, and Pickard had no personal knowledge of defendant.

In Goldsmith, two police officers were on patrol in Camden in what they believed to be a "high-crime area" known for shootings and drug dealing.  251 N.J. at 389.  While approaching a vacant house, the officers observed two individuals standing in front of it.  Ibid.  When the officers exited their vehicle, the two individuals walked away.  Ibid.  At the same time, a third person, defendant Goldsmith, exited the walkway that leads to the rear of the house.  Ibid.  One of the officers found it suspicious that defendant was on the walkway next to the vacant house and believed defendant was engaged in drug dealing activity based on the officer's training and experience.  Ibid.  The officers approached Goldsmith, blocked his path at the end of the walkway, and began questioning him, asking for his name and an explanation of his presence on that walkway.  Ibid.

One of the officers told Goldsmith that he would retrieve identification from his jacket pocket.  Ibid.  At that point, Goldsmith stated, "I appreciate if you guys didn't pat me down," arousing the officer's suspicions even further.  Ibid.  An officer conducted a pat down search for weapons, felt a weapon in

Goldsmith's jacket, and retrieved a handgun.  Ibid.  Goldsmith was arrested and charged with weapons and drug offenses.  Ibid.  He moved to suppress the handgun and drugs.[7]  Ibid.

Our Supreme Court held that the officers' investigatory detention was unlawful because the fact that Goldsmith was "coming out of a walkway between a vacant property which is known for the sales of [drugs] and weapons" after the two unidentified individuals walked away and officer's suspicions of defendant being based on his training and experience that drugs and guns are often stored in walkways, taken together did not give rise to reasonable suspicion.  Id. at 401-06.

This matter is distinguishable from Goldsmith.  Contrary to the officer in Goldsmith who relied on his experience and training and saw Goldsmith come out of a walkway between vacant property, here law enforcement relied on the evidence—such as eyewitnesses and surveillance videos—to apply for the search warrant for 1405 Park Boulevard.

Moreover, Pickard and DiDomenico did not rely solely on the fact that defendant came out of 1405 Park Boulevard as a basis to detain him.  Saliently,

---

[7]  The trial court granted the motion, finding the stop lawful, but the frisk unlawful.  However, we reversed, finding the officer's frisk of defendant was objectively reasonable.  Id. at 390.

the officers had three photos, including one of defendant, the suspected shooter in a homicide investigation. Once officers detained defendant after he fled and refused to follow commands to stop, Pickard asked defendant to do a pat-down search, which defendant agreed to, and uncovered the handgun.

Defendant failed to show grounds for reconsideration. Dissatisfied with the trial court's original decision, defendant failed to establish the trial court's finding was based on an incorrect or irrational basis. The trial court thoroughly analyzed the <u>Goldsmith</u> decision and determined it had no bearing on the decision in this case. Further, the trial court observed that the <u>Goldsmith</u> decision was available at the time of the suppression hearing and was not "new" law. We conclude the trial court did not abuse its discretion in denying defendant's motion for reconsideration and correctly addressed <u>Goldsmith</u>.

To the extent we have not specifically addressed any of defendant's arguments, it is because we have concluded they have insufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

25

A-0684-23