777 A.2d 301

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. RICHARD A. RAVOTTO, DEFENDANT–APPELLANT.

Argued May 1, 2001—Decided July 26, 2001.

230

*Ronald K. Chen,* argued the cause for appellant, *(Mr. Chen, Robert J. Bates* and *J.C. Salyer,* Staff Attorney, American Civil Liberties Union of New Jersey Foundation, attorneys; *Mr. Chen, Mr. Bates* and *Mr. Salyer,* on the briefs).

*Susan W. Sciacca,* Deputy First Assistant Prosecutor, argued the cause, for respondent, *(William H. Schmidt,* Bergen County Prosecutor, attorney).

*Linda K. Danielson,* Deputy Attorney General, argued the cause, for amicus curiae, Attorney General of New Jersey, *(John J. Farmer, Jr.,* Attorney General, attorney).

The opinion of the Court was delivered by

VERNIERO, J.

This case implicates defendant's right to be free of unreasonable searches under the federal and State Constitutions. The police arrested defendant for driving while intoxicated. Thereafter, they transported defendant to a hospital where an officer requested that medical personnel take samples of his blood to test for drug and alcohol content. Over defendant's strenuous objections, his legs and his left arm were strapped to a table, and several persons, including two police officers, held him down as a nurse drew eight vials of blood. The Law Division disallowed the use of that evidence on constitutional grounds. On leave to appeal granted to the State, the Appellate Division reversed, finding no constitutional violation. We disagree. We hold that under the totality of the circumstances the police used unreasonable force in obtaining defendant's blood sample. In view of that holding, we conclude that the Law Division properly suppressed defendant's blood alcohol content level as evidence of intoxication.

I.

Except as noted, the facts are clearly set forth in the record. In the early morning hours of January 18, 1997, defendant Richard Ravotto consumed alcohol at a friend's house. At about six

o'clock that morning, an Edgewater police officer discovered that defendant had overturned his car in a one-car accident. Officer Steven Kochis found defendant lying in the back of his car, which was entangled in a chain-link fence. The officer asked defendant if he was all right and whether anyone else was in the car. Defendant responded that he was all right and that he was alone. When an ambulance arrived, however, defendant said, "Hurry up. Hurry up. There's three of us in here." When defendant came out of the car, he said, "Ha, ha, I was only kidding."

Another officer, Edmond Sullivan, arrived at the scene. Both officers smelled a strong odor of alcohol on defendant's breath. Although he appeared disheveled, defendant had no visible injuries. As a precaution, the police tried to get defendant onto a backboard so he could be taken to a hospital in the ambulance. Defendant refused medical treatment, insisting that he was not injured. Believing such treatment was in defendant's best interests, the police and other emergency workers forced defendant onto the backboard and prepared to transport him to nearby Englewood Hospital. Defendant vigorously resisted those efforts.

Suspecting that defendant was under the influence of alcohol, Officer Kochis instructed Officer Sullivan to accompany defendant to the hospital and obtain a blood sample from him. Before departing the scene, the police placed defendant under arrest for driving while intoxicated. Defendant continued to struggle against the restraints of the backboard on the way to the hospital. Once there, defendant tried to punch an attending physician who attempted to take his blood pressure.

Shortly after arriving at the hospital, Officer Sullivan requested that medical personnel take a blood sample from defendant to test for drug and alcohol content. The officer did not obtain a warrant authorizing the taking of the sample. Before the hospital could take the blood, a police blood kit had to be delivered from police headquarters. Officer Sullivan waited an hour to receive the blood kit, then provided it to a registered nurse who took the sample. At no time did the officer offer defendant a "Breathaly-

zer" test as an alternative method of testing for alcohol content levels.

To obtain defendant's blood, Officer Sullivan and hospital personnel had to restrain defendant. Defendant's legs and his left arm were strapped to a table, and several persons, including Officer Sullivan and the officer who delivered the blood kit, held him down. The record is undisputed that defendant screamed and struggled to free himself as the nurse drew his blood. Defendant later testified that he had said repeatedly, "I'm afraid of needles. I have no problem giving you a Breathalyzer sample if that's what you want but do not take my blood." He claimed that a childhood accident had made him afraid of needles. Defendant also testified that he had felt as though he were "being raped" as the blood was taken.

The nurse took eight vials of blood, four for use by the police and four for the hospital's diagnostic purposes. The record does not clearly indicate whether the hospital would have extracted defendant's blood absent police involvement. Defendant was kept in restraints for about six hours after the blood samples were taken, and then discharged. Defendant received no other treatment while he was at the hospital.

Defendant was charged with violating *N.J.S.A.* 39:4–50, which sets forth the penalties for driving while intoxicated. A related measure, New Jersey's "implied consent" statute, provides that drivers licensed in this State shall be deemed to have given their consent to the taking of breath samples "for the purposes of making chemical tests to determine the content of alcohol in [their] blood[ .]" *N.J.S.A.* 39:4–50.2(a). The statute prohibits the police from using force in administering such tests, stating that "[n]o chemical test, provided in this section, or specimen relating thereto, may be made or taken forcibly and against physical resistance thereto by the defendant." *N.J.S.A.* 39:4–50.2(e). A driver's failure to submit to a lawfully requested test results in the loss of driving privileges for an extended period. *N.J.S.A.* 39:4–50.4a. Although the implied consent statute pertains solely to

breath tests and thus is not applicable, *State v. Woomer*, 196 *N.J.Super.* 583, 586, 483 *A.*2d 837 (App.Div.1984), we have described it here to provide a context for our disposition.

Defendant moved before the municipal court to suppress the results of the blood test, which revealed a blood alcohol content of 0.288 percent (nearly three times the legal limit). The court denied defendant's motion, holding that the police were under no obligation to give him the option of taking a Breathalyzer test. The court also concluded that the police did not have to obtain a search warrant to extract the blood because of the evanescent nature of that evidence. The court found nothing improper about the use of force by the police in taking blood from defendant.

Defendant entered a conditional plea of guilty to driving while intoxicated and appealed the denial of his suppression motion to the Law Division. The Law Division reversed the municipal court, holding that the police should have obtained at least a telephonic warrant authorizing the blood sample. The court then entered a not guilty plea on defendant's behalf and remanded the case to the municipal court for trial.

The State moved for leave to appeal before the Appellate Division, which granted the State's motion and reversed the Law Division's determination. *State v. Ravotto*, 333 *N.J.Super.* 247, 755 *A.*2d 602 (App.Div.2000). The Appellate Division noted that the rules established by the United States Supreme Court in *Schmerber v. California*, 384 *U.S.* 757, 86 *S.Ct.* 1826, 16 *L.Ed.*2d 908 (1966), permit blood to be taken over the opposition of a suspect in certain instances. *Ravotto, supra*, 333 *N.J.Super.* at 254, 755 *A.*2d 602. The panel cited other authority, including *State v. Macuk*, 57 *N.J.* 1, 268 *A.*2d 1 (1970), in which this Court held that the defendant's failure to consent to a breath test did not violate the privilege against self-incrimination. *Ravotto, supra*, 333 *N.J.Super.* at 254, 755 *A.*2d 602. The panel also cited *Woomer, supra*, 196 *N.J.Super.* at 587, 483 *A.*2d 837, in which the Appellate Division approved a police officer's threat of force to

obtain a blood sample from an intoxicated driver. *Ravotto, supra,* 333 *N.J.Super.* at 255, 755 *A.*2d 602.

Reasoning from those cases, the Appellate Division concluded that "a motor vehicle driver arrested for driving under the influence has no legal right to refuse chemical testing and the police are not required to obtain his or her consent. Further, such a driver can be restrained in order to extract a blood sample." *Id.* at 255–56, 755 *A.*2d 602. In view of defendant's accident and the evanescent nature of blood alcohol levels, the panel concluded that the police acted reasonably in transporting defendant to the hospital and ordering a blood test. The court also held that the police officer was not required to seek a telephonic search warrant simply because there was a time lag at the hospital during which he waited for the blood kit. *Id.* at 256, 755 *A.*2d 602. This Court granted defendant's petition for certification. 165 *N.J.* 677, 762 *A.*2d 657 (2000). We also granted the motion of the Attorney General for leave to appear as *amicus curiae.* (For convenience, we will refer to the State and the Attorney General collectively as the State.) We now reverse.

## II.

### A.

Under the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution, a search or an arrest by the police must be reasonable, measured in objective terms by examining the totality of the circumstances. *Ohio v. Robinette,* 519 *U.S.* 33, 39, 117 *S.Ct.* 417, 421, 136 *L.Ed.*2d 347, 354 (1996); *State v. Stelzner,* 257 *N.J.Super.* 219, 229, 608 *A.*2d 386 (App.Div.), *certif. denied,* 130 *N.J.* 396, 614 *A.*2d 619 (1992). Prior to conducting a search, the police must obtain a warrant from a judicial officer unless the search falls under one of the recognized exceptions to the warrant requirement. *Camara v. Municipal Court,* 387 *U.S.* 523, 528–29, 87 *S.Ct.*

1727, 1731, 18 *L.Ed.*2d 930, 935 (1967); *State v. Lund,* 119 *N.J.* 35, 37, 573 *A.*2d 1376 (1990).

■ As we have stated in other settings, "there is a constitutional preference for a warrant, issued by a neutral judicial officer, supported by probable cause." *State v. Cooke,* 163 *N.J.* 657, 670, 751 *A.*2d 92 (2000). Accordingly, the burden is on the government to prove the exceptional nature of the circumstances that exempts it from the warrant requirement. *Vale v. Louisiana,* 399 *U.S.* 30, 35, 90 *S.Ct.* 1969, 1972, 26 *L.Ed.*2d 409, 413 (1970); *State v. Henry,* 133 *N.J.* 104, 110, 627 *A.*2d 125, *cert. denied,* 510 *U.S.* 984, 114 *S.Ct.* 486, 126 *L.Ed.*2d 436 (1993). The State's taking of blood from a suspect constitutes a search within the meaning of the Fourth Amendment. *Schmerber, supra,* 384 *U.S.* at 767, 86 *S.Ct.* at 1834, 16 *L.Ed.*2d at 918.

■ With or without a warrant, the police may not use unreasonable force to perform a search or seizure of a person. *Graham v. Connor,* 490 *U.S.* 386, 109 *S.Ct.* 1865, 104 *L.Ed.*2d 443 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 *S.Ct.* at 1872, 104 *L.Ed.*2d at 456. See also *Abraham v. Raso,* 183 *F.*3d 279, 289 (3d Cir.1999) (emphasizing that under *Graham,* "reasonableness should be assessed in light of the 'totality of the circumstances' ").

■ More specifically, *Graham* instructs courts to employ a balancing test to determine whether the use of force in a given case is reasonable. The Supreme Court explained that the

> proper application [of the balancing test] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

> [*Graham, supra,* 490 *U.S.* at 396, 109 *S.Ct.* at 1872, 104 *L.Ed.*2d at 455.]

Because the test is an objective one, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397, 109 *S.Ct.* at 1872, 104 *L.Ed.*2d at 456.

### B.

Against the backdrop of those general principles, *Schmerber* stands as the seminal case involving the forced extraction of blood from an accused. In *Schmerber*, the defendant and a companion had been drinking at a California tavern. *Schmerber, supra,* 384 *U.S.* at 759, 86 *S.Ct.* at 1829, 16 *L.Ed.*2d at 912. They drove from the establishment around midnight in the defendant's car, which then skidded and struck a tree. *Ibid.* Both the defendant and his companion were taken to a hospital for treatment of their injuries, after which the defendant was arrested for driving while intoxicated. *Id.* at 758, 86 *S.Ct.* at 1829, 16 *L.Ed.*2d at 913. The police directed hospital personnel to take a blood sample to test the defendant's blood alcohol level, and the defendant apparently submitted to the test but did not consent to it. *Id.* at 758–59, 86 *S.Ct.* at 1829, 16 *L.Ed.*2d at 912–13.

The defendant was convicted of drunk driving and appealed on several grounds, including that the blood test violated his rights under the Fourth Amendment. In rejecting the defendant's claims, the Supreme Court framed the issues this way:

[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner. In other words, the questions we must decide in this case are whether the police were justified in requiring [the defendant] to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness.

[*Id.* at 768, 86 *S.Ct.* at 1834, 16 *L.Ed.*2d at 918.]

Within that analytical framework, the Court concluded that the defendant's intoxicated appearance (his watery, bloodshot eyes and the smell of liquor on his breath) provided probable cause for the arrest. *Id.* at 768–69, 86 *S.Ct.* at 1834–35, 16 *L.Ed.*2d at 918–

19.   It also found that because blood alcohol levels diminish rapidly, the police had acted reasonably in taking a sample of the defendant's blood after they had arrested him.  *Id.* at 770–71, 86 *S.Ct.* at 1835–36, 16 *L.Ed.*2d at 920.  The Court further found that because it was minimally intrusive and highly accurate, the defendant's blood test was a reasonable measure of blood alcohol content.  *Id.* at 771, 86 *S.Ct.* at 1836, 16 *L.Ed.*2d at 920.

Particularly pertinent to this case, the Court suggested that compulsory blood tests may not be permissible in all circumstances.  In that regard, the Court noted that the defendant was "not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as the 'Breathalyzer' test [the defendant] refused. . . . We need not decide whether such wishes would have to be respected." *Ibid.* The Court concluded that the defendant's blood test, performed by a physician in a hospital environment and without the use of force, had been performed in accordance with medically acceptable practices. *Ibid.*

The closest analogue to *Schmerber* in our State jurisprudence is *State v. Macuk.*   In that case, the police arrested the defendant after he drove his car off a road and into a ditch.  *Macuk, supra,* 57 *N.J.* at 5, 268 *A.*2d 1. The defendant admitted that he had been drinking, and the police noticed that the defendant was swaying as he stood and slurring his speech.  *Ibid.* At the police station, the police asked the defendant for breath samples, and he readily consented.  *Id.* at 6–7, 268 *A.*2d 1.   The breath test revealed a blood alcohol content of 0.18 percent, which exceeded the 0.15 percent limit in effect at that time.  *Id.* at 7, 268 *A.*2d 1. The defendant was convicted of drunk driving.

On appeal the defendant argued that before administering the breath test, the police should have informed him of the privilege against self-incrimination as required under *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).  *Macuk, supra,* 57 *N.J.* at 5, 268 *A.*2d 1. The Court rejected that claim.   Analyzing

New Jersey's implied consent statute, *N.J.S.A.* 39:4–50.2, and the applicable case law, the Court stated:

There is a clear legal right to require a motor vehicle operator, arrested on probable cause for driving 'under the influence' or 'while impaired,' to submit to a chemical test of bodily substances to determine the amount of alcohol in his blood, or, for that matter, to a physical coordination test. A breath test must, of course, be administered in accordance with the requirements of *N.J.S.A.* 39:4–50.2 and a blood test in a medically acceptable manner and environment. The latter may be used on any occasion, but will be especially useful where the person is physically unable or has refused to take a breath test. Since such tests, properly undertaken, violate no constitutional safeguard and are permissible as in any other non-testimonial situation and since our statute no longer requires consent in any situation, acquiescence is not legally significant or necessary. There is no legal right or choice to refuse, despite the authorized additional penalty for refusal in the case of the breath test.

[*Id.* at 14–15, 268 *A.*2d 1 (citations omitted).]

The Court concluded that the defendant's breath sample was nontestimonial in character and thus did not violate his Fifth Amendment privilege against self-incrimination. *Id.* at 14, 268 *A.*2d 1. See also *State v. Blair*, 45 *N.J.* 43, 46, 211 *A.*2d 196 (1965) (holding that taking of blood is not covered by Fifth Amendment). Importantly, the *Macuk* Court did not directly address any Fourth Amendment issues. The Court's language, therefore, suggesting that the acquiescence of an accused is "not legally significant or necessary" when the government extracts blood, is *dictum* in the context of the Fourth Amendment.

The Appellate Division applied *Macuk* in *State v. Burns*, 159 *N.J.Super.* 539, 388 *A.*2d 987 (App.Div.1978). In *Burns*, the police arrested the defendant because of his erratic driving. *Id.* at 541, 388 *A.*2d 987. The defendant suffered a contusion on his forehead while in police custody, and the police transported him to a hospital for medical treatment. *Ibid.* The defendant refused to consent to breath and blood tests. *Ibid.* Because the medical personnel refused to take a blood sample without the defendant's consent, the police took the defendant to a second hospital. *Ibid.* There, the defendant submitted to, but did not consent to, a blood test. *Ibid.*

The trial court suppressed the results of the blood test, concluding that it had been obtained contrary to *N.J.S.A.* 39:4–50.2, which, as noted, provides that "[n]o chemical test ... may be made or taken forcibly and against physical resistance thereto by the defendant." The court reasoned that the defendant was coerced into submission by being taken in handcuffs to the second medical center. *Id.* at 542, 388 *A.*2d 987. The Appellate Division reversed, concluding that the trial court had misinterpreted the statute. *Ibid.* The panel held that although the defendant may have been coerced into having his blood drawn, the test itself was not performed forcibly or against physical resistance. *Ibid.* Citing *Macuk*, the court also observed that the statute is limited to breath tests. The court concluded that "consent is not required to the taking of a blood sample, but the taking of such sample must be done in a medically acceptable manner and environment...." *Id.* at 544, 388 *A.*2d 987. The court added, without analysis, that the taking of blood must be performed "without force or violence or the threat of same." *Ibid.*

In another case that involved the submission of a drunk-driving suspect to a blood test, the Appellate Division again held that consent is not required to take a blood sample. *Woomer, supra,* 196 *N.J.Super.* at 585, 483 *A.*2d 837. In *Woomer,* the defendant, whose blood alcohol content was 0.225 percent, submitted to a blood test only after the police informed him that they could use force to take a sample. *Ibid.* The trial court suppressed the result of the test, finding that it had been obtained contrary to the implied consent statute. *Ibid.* The Appellate Division reversed, affirming that the statute did not apply to blood samples. The panel also stated that the fleeting reference to the use of force in *Burns* was *dictum* and, as such, it did not "contemplate facts such as are presented" in the defendant's case. *Id.* at 587, 483 *A.*2d 837. In *dictum* of its own, the *Woomer* court observed:

Indeed, a subject who resists a blood sample can be restrained in a medically acceptable way as could any other uncooperative patient. Here the police properly advised [the defendant] that they were empowered to use force if necessary to secure the blood sample. We disagree with the trial judge's characterization of

this advice as a "threat." It was not a threat at all, but an accurate statement of fact. . . . While we might conceive of circumstances in which threats of force or violence are of such an egregious nature as to implicate a due process claim or negatively affect the integrity of the medical environment, that is not the case before us.

[*Id.* at 586–87, 483 *A.*2d 837.]

The *Woomer* court thus held that the police properly may draw blood when they gain a suspect's submission by a mild threat of force. Previous case law permitted such tests in instances when a suspect submitted without the threat or use of force. *Burns, supra,* 159 *N.J.Super.* at 544, 388 *A.*2d 987. Implied in both *Burns* and *Woomer,* however, is the notion that at some level of force or coercion the police conduct in pursuit of a blood sample is impermissible. Similarly, as noted, the Supreme Court in *Schmerber* suggested that a suspect who objects to a blood test out of fear or who prefers to give a breath sample might be constitutionally entitled to avoid a blood test. *Schmerber, supra,* 384 *U.S.* at 771, 86 *S.Ct.* at 1836, 16 *L.Ed.*2d at 920.

### III.

In applying those tenets, we conclude that the force used by the police to extract defendant's blood was unreasonable under the totality of the circumstances. Defendant was terrified of needles and voiced his strong objection to the procedures used on him. He shouted and flailed as the nurse drew his blood. Several persons, including the police, and mechanical restraints were needed to hold defendant down. Defendant's fear is relevant to our analysis. A suspect's reaction to law enforcement officials is part of the fact pattern considered by a reviewing court when it determines whether police behavior was objectively reasonable. *Illinois v. Wardlow,* 528 *U.S.* 119, 124, 120 *S.Ct.* 673, 676, 145 *L.Ed.*2d 570, 576–77 (2000).

We also consider the offense that was under investigation as part of the totality of the circumstances. See *Graham, supra,* 490 *U.S.* at 396, 109 *S.Ct.* at 1872, 104 *L.Ed.*2d at 455 (explaining that severity of crime at issue is element of test for whether force

used by police was reasonable); *United States v. Garcia,* 450 *F.Supp.* 1020, 1023 (E.D.N.Y.1978) (observing that gravity of offense is pertinent to determining whether police action was reasonable). Although the Court does not diminish defendant's suspected offense or in any way condone driving while intoxicated, we note that the charge against defendant is quasi-criminal rather than criminal in nature. *State v. Widmaier,* 157 *N.J.* 475, 494, 724 *A.*2d 241 (1999). Moreover, defendant had been in a one-car accident and was not under suspicion for causing the death of or injury to any other person.

Further, we are guided by the fact that courts do not require proof of blood alcohol levels to convict drunk drivers, and that even without the blood test the police had a strong case against defendant. Defendant had flipped his car, and the police had witnessed his erratic behavior, slurred speech, and glassy eyes, and had smelled alcohol on his breath. In addition, defendant's misleading call for help from the car had evidenced his impaired state. See *State v. Emery,* 27 *N.J.* 348, 355, 142 *A.*2d 874 (1958) (upholding drunk-driving conviction on direct and circumstantial evidence); *State v. Nemesh,* 228 *N.J.Super.* 597, 550 *A.*2d 757 (App.Div.1988) (concluding that defendant's statements as well as observations of police and videotape of defendant's behavior were sufficient to support conviction for driving while intoxicated), *certif. denied,* 114 *N.J.* 473, 555 *A.*2d 600 (1989).

We reiterate that the test of reasonableness is an objective one. Therefore, the fact that the police may have acted with good motives in transporting defendant to the hospital does not "make an objectively unreasonable use of force constitutional." *Graham, supra,* 490 *U.S.* at 397, 109 *S.Ct.* at 1872, 104 *L.Ed.*2d at 456. Under *Graham,* we employ a balancing test to evaluate whether the police conduct impermissibly infringed on defendant's rights, considering all relevant facts and circumstances. *Id.* at 396, 109 *S.Ct.* at 1871, 104 *L.Ed.*2d at 455. Specifically, we consider defendant's manifest fear of needles, his violent reaction to the bodily intrusion engendered by the search, and his willingness to

take a Breathalyzer test. We then weigh those factors against the State's interest in prosecuting defendant on a quasi-criminal charge in respect of which there existed considerable proofs apart from the blood evidence. In striking that balance, we are satisfied that the forced extraction of blood in this instance offended the federal and State Constitutions.

Other courts have reasoned similarly. *See, e.g., Nelson v. City of Irvine,* 143 *F.*3d 1196 (9th Cir.) (concluding that when suspect agrees to provide equally useful chemical sample, government's need for evidentiary sample disappears), *cert. denied,* 525 *U.S.* 981, 119 *S.Ct.* 444, 142 *L.Ed.*2d 399 (1998); *Hammer v. Gross,* 932 *F.*2d 842 (9th Cir.) (*en banc* ) (upholding, in plurality opinion, jury verdict in favor of plaintiff in 42 *U.S.C.A.* § 1983 action involving forced blood sample in part because plaintiff had agreed to breath test), *cert. denied,* 502 *U.S.* 980, 112 *S.Ct.* 582, 116 *L.Ed.*2d 607 (1991). *See also People v. Kraft,* 3 *Cal.App.*3d 890, 84 *Cal.Rptr.* 280 (1970) (holding that forced blood test of defendant exceeded limits of permissible police activity).

Factually, this case resembles *State v. Sisler,* 114 *Ohio App.*3d 337, 683 *N.E.*2d 106 (1995). In *Sisler,* the police arrested the defendant for driving while intoxicated and brought him to police headquarters. *Id.* at 108. There, the defendant slipped and injured his head, necessitating a trip to a nearby hospital before he could provide a breath sample for the drunk driving investigation. *Ibid.* Once at the hospital, the defendant refused to submit to a blood test for the purposes of the police investigation. *Ibid.* Two police officers, two hospital security officers, a physician, and a nurse held the defendant down so that a sample could be taken. *Ibid.* After several failed attempts, a blood sample was successfully taken. *Ibid.*

The trial court admitted the blood sample into evidence, but the appellate court reversed. *Ibid.* The court held that because the blood sample was taken by a medical professional in a hospital environment, it had been drawn in a medically reasonable manner. *Id.* at 109. It also held, however, that by the time they sought the

blood test, the police had accumulated ample evidence to sustain a conviction against the defendant for driving while intoxicated. *Id.* at 111. Relying in part on *Schmerber,* the court concluded that the manner in which the blood was taken by the police violated the defendant's due process rights and, by extension, his Fourth Amendment rights. *Id.* at 110–11. The court summarized its holding as follows:

It offends a fundamental sense of justice, at least as this court views that concept, that an accused who has been shackled to a hospital bed is held down by six persons while a seventh jabs at his arm with a needle in order to withdraw his blood at the direction of the state's officers. Such conduct is beyond that supportable as a measure necessary for effective law enforcement.

[*Id.* at 111.]

Here, the State urges a contrary conclusion, namely, that we sustain the fruits of the search. It asserts that the police ultimately would have obtained defendant's test results, free of any constitutional taint, from the hospital itself. Under the "independent source" doctrine, the State is put in the same position in which it would have been had it not committed a constitutional error. *Nix v. Williams,* 467 *U.S.* 431, 443, 104 *S.Ct.* 2501, 2509, 81 *L.Ed.*2d 377, 387 (1984). Accordingly, if the hospital had obtained blood alcohol readings on its own, the police might have acquired those readings in the regular course of their investigation. See *State v. Dyal,* 97 *N.J.* 229, 232, 478 *A.*2d 390 (1984) (holding that police may obtain blood tests of patient by use of subpoena *duces tecum* ).

Our review of the record persuades us that the independent source doctrine is not applicable. That the hospital staff would have taken a blood test absent the police request is unclear. The police officers and the nurse who took the blood testified that the blood tests had been required by the police for investigative purposes. The nurse testified that he had taken four vials of blood for police purposes, and then "four additional tubes for hospital purposes," permitting the reasonable inference that the nurse's primary purpose in taking the sample was to assist the police. To support that inference, defense counsel asked the

nurse on cross-examination: "It was your intent to provide ... a sample for the law enforcement officers and to assist them in their investigation, is that right?" The nurse replied, "[T]hat is correct."

Even if the hospital had required its own blood samples for diagnostic purposes, once the State assisted in the forced taking of those samples it could no longer acquire them under the independent source doctrine. *State v. Sugar,* 100 *N.J.* 214, 237, 495 *A.*2d 90 (1985) (explaining how independent source doctrine allows admission of evidence " 'that has been discovered by means wholly independent of any constitutional violation' ") (quoting *Williams, supra,* 467 *U.S.* at 443, 104 *S.Ct.* at 2509, 81 *L.Ed.*2d at 387). *See also Gilbert v. Leach,* 62 *Mich.App.* 722, 233 *N.W.*2d 840, 843 (1975) (concluding that police officer's request to medical personnel for blood sample from accused constituted state action within context of exclusionary rule), *aff'd sub nom. McNitt v. Citco Drilling Co.,* 397 *Mich.* 384, 245 *N.W.*2d 18 (1976).

In short, we cannot conclude on this record that the hospital staff would have obtained blood samples from an uncooperative but seemingly uninjured driver such as defendant without the request and aid of the police. Stated differently, the record supports a reasonable inference that the medical personnel would have respected defendant's wishes not to have his blood drawn if he had been free of police supervision. Because of the important rights at stake and in view of the fact that the State has the burden of justifying its actions, we must resolve any doubts in favor of defendant.

Further, as noted, the police apparently made no effort to offer defendant a Breathalyzer test in lieu of the blood test. Although the police are not obligated to favor one test over the other, their failure to explore the possibility of administering the Breathalyzer test is a factor to be considered in our overall reasonableness inquiry. The record suggests that there was no Breathalyzer available at Englewood Hospital, although one was available and in working condition at the Edgewater police headquarters a short

distance away. That, in turn, suggests that after the police had secured medical treatment for defendant at the hospital, they might have transported him to police headquarters to administer the Breathalyzer. If defendant's medical condition had precluded him from being transported safely to police headquarters, a mobile Breathalyzer unit may have been available from a nearby police station for use at the hospital. The record reveals no attempt by the police to locate such a unit for that purpose.

The State's reliance on *Schmerber, Macuk,* and *Woomer* is also misplaced. *Schmerber* did not involve any use of force by the police, nor did the defendant there object to the medical procedure out of fear or offer to submit to an alternate method of testing. Likewise, *Macuk* is distinguishable because the *Macuk* Court focused on the privilege against self-incrimination as opposed to the issue presented in this case, namely, whether the search violated defendant's Fourth Amendment rights. Lastly, although *Woomer* provides a measure of support for the State's position, the Appellate Division in that case stated that at some level of force the police conduct in pursuit of a blood sample would be impermissible.

Such is the case here. We are mindful that the consent of an accused to an otherwise valid search is not strictly required under the teachings of *Schmerber, Macuk,* and *Woomer.* In those cases each defendant ultimately submitted to the police conduct. In this case, however, defendant neither consented nor submitted to the drawing of his blood as evidenced by his violent resistance to that action. To determine whether modern precepts of reasonableness have been breached, we consider all relevant factors, including the government's need for the evidence and defendant's interest in avoiding unnecessary bodily intrusions. In so doing, we cannot sustain this search for the reasons already stated.

## IV.

The dissent characterizes our reliance on *Graham* as "suspect," *post* at 254, 777 *A.*2d at 317. We disagree. In *Graham,* the Supreme Court declared:

Today we make explicit ... and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, *or other "seizure" of a free citizen* should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against ... physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the countervailing governmental interests at stake.

[*Graham, supra,* 490 *U.S.* at 395–96, 109 *S.Ct.* at 1871, 104 *L.Ed.*2d at 454–55 (footnote omitted) (second emphasis added).]

Because the State's taking of blood in this case constituted a "search" and antecedent "seizure" of defendant's person within the meaning of our search-and-seizure jurisprudence, *Graham* by its own terms is relevant to our analysis. See *Schmerber, supra,* 384 *U.S.* at 767, 86 *S.Ct.* at 1834, 16 *L.Ed.*2d at 918 (concluding that administration of blood tests "plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons,' within the meaning of [the Fourth] Amendment").

We are satisfied that *Graham* provides the appropriate analytical framework within which to evaluate defendant's constitutional claims. Within that framework, our analysis is informed by the holdings in *Schmerber* and the other cited cases specifically involving blood extraction. See also *Hammer, supra,* 932 *F.*2d at 844–45 (applying in part *Graham* balancing test in plurality opinion involving drunk-driving suspect's forced blood sample); *State v. Clary,* 196 *Ariz.* 610, 2 *P.*3d 1255 (App.2000) (applying *Graham* balancing test in cases involving drunk-driving suspect's forced blood sample); *People v. Hanna,* 223 *Mich.App.* 466, 567 *N.W.*2d 12 (1997) (same), *appeal denied,* 458 *Mich.* 862, 587 *N.W.*2d 637 (1998), *recons. denied,* 459 *Mich.* 1005, 595 *N.W.*2d 827 (1999), *cert. denied,* 528 *U.S.* 1131, 120 *S.Ct.* 970, 145 *L.Ed.*2d 840 (2000); *State v. Krause,* 168 *Wis.*2d 578, 484 *N.W.*2d 347 (App.) (same), *review denied,* 490 *N.W.*2d 22 (Wis.1992).

The dissent places undue significance on a brief footnote in *Schmerber* in which the Supreme Court stated: "We 'cannot see that it should make any difference whether [an arrestee] states unequivocally that he objects or resorts to physical violence in protest or is in such a condition that he is able to protest.' " *Schmerber, supra,* 384 *U.S.* at 760 n. 4, 86 *S.Ct.* at 1830 n. 4, 16 *L.Ed.*2d at 913 n. 4 (quoting *Breithaupt v. Abram,* 352 *U.S.* 432, 441, 77 *S.Ct.* 408, 413, 1 *L.Ed.*2d 448, 454 (1957) (Warren, C.J., dissenting)). That statement must be viewed in context. The footnote indicates the *Schmerber* Court's willingness to tolerate the use of force to confront a hypothetical suspect's violent protestations, but such force by the police is always subject to limits. In the same footnote, the Court emphasized that "[i]t would be a different case if the police ... responded to resistance with inappropriate force." *Id.* at 760 n. 4, 86 *S.Ct.* at 1830 n. 4, 16 *L.Ed.*2d at 913 n. 4. Moreover, the *Schmerber* Court expressly stated that its holding pertained only to the fact pattern before it. *Id.* at 772, 86 *S.Ct.* at 1836, 16 *L.Ed.*2d at 920.

Accordingly, we do not interpret *Schmerber* to require us to discount or ignore a defendant's violent reaction to blood extraction. Rather, as explained elsewhere, defendant's reaction is but one of a number of facts that comprise the totality of the circumstances in this case. Just as the *Schmerber* Court made clear that some level of force by the government would be unacceptable, we recognize that, under different circumstances, some level of force by the police to obtain evidence from obstreperous defendants might be acceptable. We do not interpret the dissent as suggesting that any use of force on uncooperative suspects would be constitutionally appropriate. At bottom, our disagreement is over when such force may be applied appropriately.

The dissent also advocates a remand to afford the State the opportunity to clarify or develop the record on the availability of the Breathalyzer as well as in respect of other possible issues. Contrary to the dissent's portrayal, our disposition does not "rel[y] heavily" on defendant's offer to submit to a Breathalyzer, or on

any one factor in the analysis. *Post* at 257, 777 *A*.2d at 319. Indeed, we state at the outset of this opinion that our holding is based on "the totality of the circumstances," *ante* at 231, 777 *A*.2d at 316, and that "the quantum of force used by the police, although significant to the analysis, is not the sole factor to be considered." *Post* at 251, 777 *A*.2d at 315.

We are convinced that our disposition would not be altered by a remand in view of these uncontested facts: (1) defendant's alleged offense, although serious, did not involve the death of or injury to any other person; (2) the police possessed considerable evidence of defendant's impaired state apart from the blood sample, including that (a) defendant had flipped his car, which was found entangled in a chain-link fence, (b) the police had witnessed defendant's erratic behavior, slurred speech, and glassy eyes, and had smelled alcohol on his breath, and (c) defendant had made a misleading call for help from his car; (3) defendant's manifest fear of needles; (4) the nature of the search as a form of bodily intrusion; (5) defendant's violent reaction to that intrusion; (6) the testimony of the nurse that he had extracted defendant's blood at the request of the police; (7) the fact that two police officers assisted in the extraction by holding defendant to the table as his legs and one arm were strapped; and (8) the level of force itself.

Finally, the dissent sees strong parallels between the facts in this case and those in *Schmerber.* Although there may be some similarities in the two cases, there are major differences. As indicated above, in *Schmerber,* there was no use of force by the police, no physical resistance by the accused to the blood sample, and no indication that the accused feared needles. Clearly, those factors are evident here. We reiterate that the *Schmerber* Court explicitly limited its holding to the facts presented in that case. The Court stated:

> We thus conclude that the present record shows no violation of [the defendant's] right under the Fourth ... Amendment[ ] to be free of unreasonable searches and seizures. It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished

value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, *or intrusions under other conditions.*

[*Schmerber, supra,* 384 *U.S.* at 772, 86 *S.Ct.* at 1836, 16 *L.Ed.*2d at 920 (emphasis added).]

In short, the "other conditions" not present in *Schmerber,* but present here, compel our disposition.

## V.

Our holding is not to be understood as suggesting that the police had to acquire a warrant before obtaining a blood sample from defendant or that they acted in an unreasonable manner in seeking treatment for him at the hospital. Because defendant's car was found overturned and his behavior demonstrated obvious signs of intoxication, probable cause existed for the police to seek evidence of defendant's blood alcohol content level. Moreover, consistent with *Schmerber* and our analogous case law, the dissipating nature of the alcohol content in defendant's blood presented an exigency that required prompt action by the police. Under those conditions, a warrantless search was justified. *Schmerber, supra,* 384 *U.S.* at 771, 86 *S.Ct.* at 1836, 16 *L.Ed.*2d at 920 (upholding taking of suspect's blood without warrant due to rapid dissipation of alcohol content level in such evidence). *See also Cooke, supra,* 163 *N.J.* at 676, 751 *A.*2d 92 (explaining that "exigency in the constitutional context amounts to 'circumstances that make it impracticable to obtain a warrant when the police have probable cause' " to act) (quoting *State v. Colvin,* 123 *N.J.* 428, 437, 587 *A.*2d 1278 (1991)).

Nor do we suggest that the right to be free of unreasonable searches turns solely on whether a defendant objects to police conduct or resists an otherwise legitimate law enforcement action. To the contrary, the same or even greater level of force than was used here could be reasonable in a different setting. We emphasize that the reasonableness inquiry we employ is fact sensitive and offers no sure outcomes in future cases. *Graham, supra,* 490 *U.S.* at 396, 109 *S.Ct.* at 1872, 104 *L.Ed.*2d at 456. As this case

demonstrates, the quantum of force used by the police, although significant to the analysis, is not the sole factor to be considered. *Ibid.*

Similarly, we are satisfied that our holding will not unduly hamper the ability of the police to bring intoxicated motorists to justice. First, as noted, blood or breath testing is not always critical to the State's case. Second, we leave undisturbed the ability of the police to use all reasonable investigative techniques normally at their disposal to obtain blood samples or other proofs necessary for their work. Third, our sense from the record is that this case, with its unique facts and circumstances, is not likely to be replicated with any regularity.

In addition, with its prohibition against the use of force, New Jersey's implied consent statute embodies the Legislature's own concern over the intrusion engendered by conducting chemical tests against a driver's will. The Legislature resolved those concerns by providing sanctions for any person who refuses to submit to a Breathalyzer test when lawfully accused of driving while intoxicated. *N.J.S.A.* 39:4-50.4a. The Legislature is free to revise that statute to provide similar sanctions for persons who refuse to submit to blood tests in the same circumstances.

Lastly, we note for completeness that our disposition is required under both the Fourth Amendment and the analogous provision in the New Jersey Constitution. Although our holding is consistent with federal jurisprudence, we also conclude that the forced extraction of defendant's blood was impermissible on State constitutional grounds for the reasons previously expressed. See *Cooke, supra,* 163 *N.J.* at 666–67, 751 *A.*2d 92 (outlining those instances in which "this Court has interpreted our State Constitution as affording its citizens greater protections than those afforded by its federal counterpart"). See also *State v. Johnson,* 168 *N.J.* 608, 775 *A.*2d 1273 (2001) (suppressing evidence obtained by invalid "no-knock" warrant on federal and State constitutional grounds).

## VI.

In sum, the police had probable cause to arrest defendant, and due to exigency, they were not required to obtain a search warrant authorizing the blood sample. Moreover, the police acted properly in transporting defendant to a hospital and seeking the blood test in a medically reasonable manner. We conclude, however, that the police used unreasonable force to acquire the blood sample from defendant against whom they already had considerable evidence. On that basis, the fruits of the search cannot be sustained.

## VII.

The judgment of the Appellate Division is reversed. On remand to the municipal court, the evidence of defendant's blood alcohol content will be suppressed, and defendant's not guilty plea will be reinstated.

LaVECCHIA, J., dissenting.

The majority concludes, *ante* at 252, 777 *A.*2d at 316, that "the police had probable cause to arrest defendant, and due to exigency, they were not required to obtain a search warrant authorizing the blood sample. Moreover, the police acted properly in transporting defendant to a hospital and seeking the blood test in a medically reasonable manner." Yet, the majority decides that application of the "objectively reasonable" test nonetheless requires that the results of the blood test must be suppressed because excessive force was employed to obtain the blood samples. The majority's basis for its holding seems to be the lack of proof in the record that less intrusive means to test for blood alcohol content were unavailable. I disagree with the majority. Although the availability of less intrusive testing means is certainly a factor to be considered in weighing the totality of circumstances under the "objectively reasonable" test, I disagree with the majority's conclusion that the record speaks with clarity on that issue. At best it is ambiguous. In my view, to assess properly the totality

of circumstances that unfolded in the early morning hours of January 18, 1997, a remand is necessary. Therefore, I respectfully dissent from the judgment of the Court.

I.

The majority recognizes *Schmerber v. California,* 384 *U.S.* 757, 86 *S.Ct.* 1826, 16 *L.Ed.*2d 908 (1966), "as the seminal case involving the forced extraction of blood from an accused," *ante* at 237, 777 *A.*2d at 307. *Winston v. Lee,* 470 *U.S.* 753, 105 *S.Ct.* 1611, 84 *L.Ed.*2d 662 (1985), however, is instructive also. Justice Brennan wrote the opinions in both *Winston* and *Schmerber,* and he discussed *Schmerber* extensively in his *Winston* opinion. *Winston* and *Schmerber* set out the relevant factors to be considered and the weight or content to be ascribed to those factors in the balancing test for determining objective reasonableness of the force used in a search of the person that implicates bodily integrity. Variables on one side of the scale are (1) "the extent to which the procedure may threaten the safety or health of the individual" and (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity." *Winston, supra,* 470 *U.S.* at 761, 105 *S.Ct.* at 1617, 84 *L.Ed.*2d at 669. The Court also has ascribed content to those variables.

When assigning weight to whether the procedure may threaten the safety or health of the individual, the Court consistently has stated: " '[F]or most people [a blood test] involves virtually no risk, trauma, or pain.' " *Ibid.* (quoting *Schmerber, supra,* 384 *U.S.* at 771, 86 *S.Ct.* at 1836, 16 *L.Ed.*2d at 920); *see also S.D. v. Neville,* 459 *U.S.* 553, 563, 103 *S.Ct.* 916, 922, 74 *L.Ed.*2d 748, 758 (1983) ("The simple blood-alcohol test is ... safe, painless, and commonplace."); *Breithaupt v. Abram,* 352 *U.S.* 432, 436, 77 *S.Ct.* 408, 410, 1 *L.Ed.*2d 448, 451 (1957)("The blood test procedure has become routine in our everyday life."). When assigning weight to the degree of intrusion on an individual's privacy and bodily integrity, the Court in *Winston* wrote: "In noting that a blood test was 'a commonplace in these days of periodic physical examina-

tions,' *Schmerber* recognized society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity." 470 *U.S.* at 762, 105 *S.Ct.* at 1617, 84 *L.Ed.*2d at 670 (citation omitted); *see also Skinner v. Ry. Labor Executives' Ass'n,* 489 *U.S.* 602, 625, 109 *S.Ct.* 1402, 1417, 103 *L.Ed.*2d 639, 665 (1989) (noting that *Schmerber* established that governmentally imposed blood test is not unduly extensive imposition on person's privacy and bodily integrity).

In contrast to those characterizations, the majority here posits the factors of "defendant's manifest fear of needles, his violent reaction to the bodily intrusion engendered by the search, and his willingness to take a Breathalyzer test." *Ante* at 242, 777 *A.*2d at 310. The majority also finds in *Graham v. Connor,* 490 *U.S.* 386, 109 *S.Ct.* 1865, 104 *L.Ed.*2d 443 (1989), a basis for including in the analysis the severity of the crime. The majority's insistence that *Graham* is relevant here is suspect. *Graham* dealt with the appropriate use of force to effect an investigatory stop, or arrest, but the case before us deals with the reasonableness of force used to search an individual already under arrest. The importance of the severity of the criminal activity in weighing the reasonableness of force in the former setting is apparent. Why it is relevant to the circumstances of this case, however, escapes me.

The majority extracted two of its other factors-fear and willingness to take a Breathalyzer—from *Schmerber*'s qualifier that the defendant there was "not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as the 'Breathalyzer' test [the defendant] refused." 384 *U.S.* at 771, 86 *S.Ct.* at 1836, 16 *L.Ed.*2d at 920. *Schmerber* thus expressly reserved the question whether the government could forcibly extract blood when an arrestee requests an available Breathalyzer test. In *Schmerber,* the Court was willing to contemplate that the "fear" of a defendant would be respected when that fearful defendant requested the available alternative method. It did not exalt fear, however, as something a

defendant may assert to avoid a search altogether. The crucial premise for respecting a defendant's fear is that a Breathalyzer test is a readily available alternative. There is nothing in this record to indicate that that was so. The majority merely presumes it to be so. Moreover, the third factor—defendant's "violent reaction"—was specifically discounted by the Supreme Court in *Schmerber*. There, the Court said: "We 'cannot see that it should make any difference whether [an arrestee] states unequivocally that he objects or resorts to physical violence in protest or is in such a condition that he is unable to protest.' " *Schmerber*, *supra*, 384 *U.S.* at 760 n. 4, 86 *S.Ct.* at 1830 n. 4, 16 *L.Ed.*2d at 913 n. 4 (quoting *Breithaupt*, *supra*, 352 *U.S.* at 441, 77 *S.Ct.* at 413, 1 *L.Ed.*2d at 454 (Warren, C.J., dissenting)). Yet, the majority here claims that defendant's "violent reaction" should be a factor militating against the reasonableness of the search.

The majority emphasizes that defendant was charged with drunk driving, which is a quasi-criminal offense, as if that fact should somehow limit the State's ability to obtain evidence of guilt. It also refers to the existence of "considerable proofs apart from the blood evidence." *Ante* at 243, 777 *A.*2d at 310. The majority's analysis is in contradiction to *Winston, Schmerber,* and *Breithaupt.* In *Winston,* the Court determined that the identified individual interests must weigh against

> the community's interest in *fairly and accurately* determining guilt or innocence. This interest is of course of *great importance.* We noted in *Schmerber* that a blood test is "a highly effective means of determining the degree to which a person is under the influence of alcohol." Moreover, there was "a clear indication that in fact [desired] evidence [would] be found" if the blood test were undertaken. *Especially given the difficulty of proving drunkenness by other means,* these considerations showed that results of the blood test were of *vital importance* if the State were to enforce its drunken driving laws.
>
> [470 *U.S.* at 762–63, 105 *S.Ct.* at 1617–18, 84 *L.Ed.*2d at 670 (emphasis added) (citations omitted).]

That view from *Winston* and *Schmerber* is buttressed by the Court's observations in *Breithaupt:*

> Modern community living requires modern scientific methods of crime detection lest the public go unprotected. The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the

battlefield. The States, through safety measures, modern scientific methods and strict enforcement of traffic laws, are using all reasonable means to make automobile driving less dangerous.

As against the right of an individual that his person be held inviolable, even against so slight an intrusion as is involved in applying a blood test of the kind to which millions of Americans submit as a matter of course nearly every day, must be set the interests of society in the *scientific determination of intoxication,* one of the great causes of the mortal hazards of the road. And the more so since the test likewise may establish innocence, thus affording protection against the treachery of judgment based on one or more of the senses. Furthermore, since our criminal law is to no small extent justified by the *assumption of deterrence,* the individual's right to immunity from such invasion of the body as is involved in a properly safeguarded blood test is *far outweighed by the value of its deterrent effect due to public realization that the issue of driving while under the influence of alcohol can often by this method be taken out of the confusion of conflicting contentions.* [352 *U.S.* at 439–40, 77 *S.Ct.* at 412, 1 *L.Ed.*2d at 452–53 (emphasis added) (footnotes omitted).]

Therefore, in *Winston, Schmerber,* and *Breithaupt,* the Supreme Court considered the seriousness of the charge of drunk driving and available evidence of guilt, and came to conclusions that were precisely contrary to that reached by the majority here.

*Schmerber* speaks specifically to the irrelevance of the existence of "considerable proofs apart from blood evidence." There, the Court described how "[t]he police officer who arrived at the scene shortly after the accident smelled liquor on [the defendant's] breath, and testified that [the defendant's] eyes were 'bloodshot, watery, sort of a glassy appearance.' The officer saw [the defendant] again at the hospital, within two hours of the accident. There he noticed similar symptoms of drunkenness." 384 *U.S.* at 768–69, 86 *S.Ct.* at 1834–35, 16 *L.Ed.*2d at 918–19. The closeness of that description strikingly compares with the majority's description of the alternative proofs in this case: "Defendant had flipped his car, and the police had witnessed his erratic behavior, slurred speech, and glassy eyes, and had smelled alcohol on his breath. Further, defendant's misleading call for help from the car had evidenced his impaired state." This Court's description essentially mirrors *Schmerber*'s description. *Schmerber* articulated those facts not to explain why a blood test was unnecessary, but to show that probable cause to arrest was established and that a test of the

defendant's blood alcohol content would be exceptionally probative in confirming intoxication. An irony thus is built into the majority's analysis: The more direct-observation evidence or proof police have to establish probable cause to arrest and that a blood test is likely to produce success (the *Schmerber* standard), the less police have reason to pursue a blood test because "considerable proofs apart from the blood evidence" exist, *ante* at 243, 777 *A.*2d at 310. The fact that a defendant "exhibit[s] numerous other indicia of intoxication does not negate the state's need for [the defendant's] BAC. On the contrary, accurate, scientific evidence of BAC is needed to secure [DUI] convictions so that those who drive while intoxicated will be punished and others will be deterred from doing so." *State v. Krause*, 168 *Wis.*2d 578, 484 *N.W.*2d 347, 352 (App.), *review denied*, 490 *N.W.*2d 22 (Wis.1992).

## II.

As noted, the majority relies heavily on the fact that defendant was restrained during the taking of the blood specimens and that he offered to take a Breathalyzer test once he was at the hospital. Nonetheless, a blood test was taken by medical personnel and the record is unclear whether it was taken, in part, for diagnostic purposes. Concerning the restraints, it is true that while at the hospital, defendant was restrained with arm and leg straps. And, while taking the blood sample, the nurse was assisted by a police officer who kept defendant's arm still. The record unmistakenly reflects that defendant was not restrained by the straps applied to his arm and legs *in order to* take a blood sample. Defendant was strapped to the examination table because he was so unruly and aggressive that he attempted to punch the attending physician who sought to take defendant's blood pressure upon his arrival in the emergency ward. Anyone who has spent time in a hospital emergency ward knows the obvious danger to medical staff and other patients posed by aggressive and violent patients brought in, often by police, as a result of alleged criminal activity. Whether due to drug ingestion, knife or gunshot wounds or, as here, a

suspected drunk driving accident, police escort to the hospital is *de regeur* to provide immediate medical evaluation and necessary care to a suspect, or one already placed under arrest.

The police acted reasonably in bringing defendant to the hospital in the first instance after finding him in an overturned car with a chain link fence wrapped around it. Defendant's agitation started while at the accident scene. He was aggressive and uncooperative as the police and emergency medical personnel attempted to provide him with care. He made unreasonable statements. All that can reflect the existence of internal injuries. The majority notes the reasonableness of the police action in bringing defendant to the hospital. The record also reflects that defendant was placed in strapped restraints upon defendant's physical attack of medical personnel. Yet, somehow the majority finds that combination of circumstances to translate into objectively unreasonable police behavior. Similarly, the majority finds it unreasonable for the police to have helped keep defendant's arm still while medical staff extracted a blood specimen from a patient. I would find it unreasonable not to acknowledge that police officers are called upon regularly to perform such necessary tasks in emergency wards. Defendant is not the first patient to resist during the course of medical evaluation or treatment.

What is different here is that the majority is not convinced that the medical staff was taking the blood for its own purposes. Instead, the majority suggests that the blood sample was taken only to accommodate the police request. That conclusion rests on the slim reed of inconclusive testimony that was not fully explored in the record below. That inadequacy in the record, coupled with other critical inadequacies, should compel a remand on the objective reasonableness of the police officers' action. The majority acknowledges the incompleteness of the record concerning the availability of Breathalyzer equipment at the hospital. Also, the majority's opinion reflects the incompleteness of the record concerning whether defendant could be taken from the hospital to a Breathalyzer unit at police headquarters or whether a mobile

Breathalyzer unit could be brought to the hospital. Instead of requiring a remand to examine those critical elements, the majority simply concludes that the police did not demonstrate that a Breathalyzer was not available, nor did the police show that they could not take defendant to one once defendant was at the hospital.

The majority, *ante* at 243, 777 *A*.2d at 310, favorably cites two Ninth Circuit cases, *Nelson v. City of Irvine*, 143 *F*.3d 1196 (9th Cir.), *cert. denied*, 525 *U.S.* 981, 119 *S.Ct.* 444, 142 *L.Ed*.2d 399 (1998), and *Hammer v. Gross*, 932 *F*.2d 842 (9th Cir.) (en banc), *cert. denied*, 502 *U.S.* 980, 112 *S.Ct.* 582, 116 *L.Ed*.2d 607 (1991). But both cases illustrate why a remand on the Breathalyzer issue is critical in the present appeal. In *Hammer*, "a majority of the en banc panel indicated that *if an alternative test is readily available*, and the suspect requests it, a rational jury could conclude that it is unreasonable and in violation of the Fourth Amendment for police officers to insist on a blood test." *Nelson*, *supra*, 143 *F*.3d at 1202–03 (emphasis added). In his concurrence Judge Kozinski, also criticizing the majority in *Hammer* for invoking *Graham*, directed his conclusion to the essential and determinative fact, namely that the officer "acted properly in every respect but one: He failed to give Hammer an alternative test when Hammer consented to it and when (*it appears from the record*) the alternative was *readily available*." *Hammer, supra*, 932 *F*.2d at 853 (Kozinski, J., concurring in part) (emphasis added). Judge Kozinski set out a reasonableness standard:

> If an alternative test is readily available and a suspect requests it, police officers may not arbitrarily refuse to administer it simply because the suspect did not have the presence of mind to make a decision more promptly or because he changed his mind. The standard, as always under the fourth amendment, is reasonableness. Defendants have offered no explanation for [the officer's] refusal to comply with Hammer's request. Based on the evidence, the jury could conclude that [the officer's] refusal to administer an alternative test was unreasonable.
>
> [*Id.* at 852 (Kozinski, J., concurring in part).]

In *Nelson*, the Ninth Circuit similarly held that "[w]hen an arrestee has agreed to submit to a breath or urine test *which is*

*available* and of *similar evidentiary value,* the government's need for a blood test disappears." 143 *F.*3d at 1207 (emphasis added). Instead of deciding the matter then, the Ninth Circuit stated that "[f]actual development at trial may affect the ultimate determination whether the plaintiffs' requests for alternative forms of testing, which the police refused to respect, were in fact reasonable under the circumstances." *Ibid.*

The majority here notes that the police were reasonable in their insistence that defendant go to the hospital as a precautionary measure after the accident. And, it is uncontroverted that there were no Breathalyzers at the hospital, although there was a Breathalyzer available at the Edgewater Police Headquarters. What is unclear from this record is whether any portable Breathalyzers were available or whether it was possible to have transported defendant to a Breathalyzer. Unlike the majority, I am unwilling to conclude that the police acted unreasonably without knowing the answers to those questions. But if the alternative of a Breathalyzer was truly unavailable, and considering the evanescent nature of the evidence, then the defendant's offer to take the Breathalyzer is meaningless.

### III.

The involuntary taking of a blood sample from a driver, arrested on probable cause of intoxication, has been regarded as permissible in New Jersey for decades. *State v. Dyal,* 97 *N.J.* 229, 238, 478 *A.*2d 390 (1984) ("A drunken driver arrested by police with probable cause to believe he is intoxicated has no federal constitutional right to prevent the involuntary taking of a blood sample. Of course, the sample should be taken in a medically acceptable manner at a hospital or other suitable health care facility." (citing *Schmerber, supra,* 384 *U.S.* at 771–72, 86 *S.Ct.* at 1836, 16 *L.Ed.*2d at 920)). The seemingly new question presented here is whether a defendant must submit passively to the test, or whether we afford the aggressive, uncooperative, and violent patient the right to destroy evanescent evidence.

In stating that it makes no difference if an arrestee "resorts to physical violence to protest," *Schmerber* clearly contemplates that police may use some degree of force to extract a blood sample. The question is whether the force used is excessive. The Court in *Schmerber* said that "[i]t would be a different case if the police initiated the violence, refused to respect a reasonable request to undergo a different form of testing, or responded to resistance with inappropriate force." 384 *U.S.* at 760 n. 4, 86 *S.Ct.* at 1830 n. 4, 16 *L.Ed.*2d at 913 n. 4. Unquestionably, police did not initiate the violence in this case.

Second, a "reasonable request to undergo a different form of testing" only becomes "reasonable" if a different form is readily available. Here, the record does not clearly indicate the ready availability of a Breathalyzer. We do know that the police took the reasonable step of taking defendant to a hospital, which inhibited their ability to use a Breathalyzer at the station. The majority here approves the reasonableness of the police action in taking defendant to the hospital, but then penalizes them in practice by deeming the blood test results inadmissible.

Finally, the question of "excessive" force assumes an examination of whether there was a disproportionality between the force employed in relation to the degree of resistance. By the majority's own description, defendant was belligerent and violent from the moment he was extracted from his crumpled car. Under the majority's analysis, the belligerence and violence of the uncooperative and recalcitrant arrestee is recognized and effectively rewarded. Considering that high degree of resistance from defendant, no more force was used here than that minimally necessary to secure the blood sample safely. Other courts have permitted police to use significant force to subdue suspects and secure safe blood tests. *People v. Ryan*, 116 *Cal.App.*3d 168, 171 *Cal.Rptr.* 854, 862 (1981) (determining that five officers restrained accused while technician drew blood from accused's arm and concluding that there was "no evidence whatsoever that the police used more force than necessary to overcome [the accused's] resistance or

introduced any wantonness, violence or beatings"); *People v. Hanna*, 223 *Mich.App.* 466, 567 *N.W.*2d 12, 16 (1997) (concluding that officers' application of restraints to pressure points on uncooperative suspect's wrists to facilitate safe drawing of blood was reasonable use of force), *appeal denied*, 458 *Mich.* 862, 587 *N.W.*2d 637 (1998), *recons. denied*, 459 *Mich.* 1005, 595 *N.W.*2d 827 (1999), *cert. denied*, 528 *U.S.* 1131, 120 *S.Ct.* 970, 145 *L.Ed.*2d 840 (2000); *State v. Lanier*, 452 *N.W.*2d 144, 147 (S.D.1990) (determining that five or six officers restrained accused while technician withdrew blood and holding that force used did not exceed amount necessary to effect drawing of blood). Because of his belligerence, defendant was strapped down for his safety and the safety of hospital staff long before a blood-sample extraction was attempted. "The amount of force or strength used legally to overcome resistance must always be greater than the resistance." *People v. Kraft*, 3 *Cal.App.*3d 890, 84 *Cal.Rptr.* 280, 287 (1970) (David, J., concurring and dissenting). The upshot of the majority's analysis "seems to be that if a drunk resists enough, his chances of 'beating the rap' increase proportionately with his resistance, followed by his claim of the use of inappropriate force to subdue him." *Id.* at 288 (David, J., concurring and dissenting); *see also Hammer*, *supra*, 932 *F.*2d at 855 (Fernandez, J., dissenting) (noting that "the effect of [the majority's] decision is that blood cannot be extracted from a drunk who refuses to have it done, and this is particularly so if the drunk is willing to become the least bit physical about it"); *Carleton v.Super. Ct.*, 170 *Cal.App.*3d 1182, 216 *Cal.Rptr.* 890, 896 (1985) (noting that whether blood alcohol test may be obtained "should not turn on the degree of a defendant's cooperation with a premium given to the more obstreperous drunk driver who is more successful in forcibly resisting the withdrawal of a blood sample"). Permitting "DUI suspects who are most uncooperative or belligerent, and probably most impaired, [to] avoid giving crucial evidence simply because they choose not to" places drunk drivers "in control of the giving of blood evidence and might well encourage violence and unlawful

behavior." *State v. Clary*, 196 *Ariz.* 610, 2 *P.*3d 1255, 1259 (App.2000).

## IV.

The question of objective reasonableness is not as clear as the majority presents, and the record is inadequate for purposes of addressing thoroughly that question. Each step of the critical events should be examined in the context in which it arose. After all, the police action must be regarded as having been taken during exigent circumstances, and was designed to preserve evanescent evidence while securing defendant adequate medical evaluation and care. I would remand the matter for a full hearing on the subject. Finally, I note my disagreement with the majority's conclusion that its holding is based on its view of the requirements of our State Constitution, thus seemingly insulating it from further review if its application of United States constitutional law is in error. If our Court is to read the language of article I, paragraph 7 of our Constitution as diverging from federal jurisprudence concerning the virtually identical language of the Fourth Amendment, then the majority must have a sound basis for that divergence. In my view, this case falls short of convincingly articulating a basis for that divergence that comports with the standards that this Court has developed. See *State v. Hempele*, 120 *N.J.* 182, 229–31, 576 *A.*2d 793 (1990) (Garibaldi, J., dissenting) (setting forth criteria applied by Court to support divergence from federal law on search and seizure) and cases cited therein.

I respectfully dissent. The Chief Justice joins in this dissent.

*For reversal and remandment*—Justices STEIN, COLEMAN, LONG, VERNIERO, and ZAZZALI—5.

*Dissenting*—Chief Justice PORITZ and Justice LaVECCHIA—2.